THE MARLIN FIRE ARMS COMPANY, Respondent, *v.* GEORGE
O. SHIELDS, Appellant.

EQUITY — WHEN LIBEL RELATING TO MANUFACTURED ARTICLE CANNOT
BE RESTRAINED BY INJUNCTION. Unjust and malicious criticisms of a
manufactured article published in a magazine, for which the manufacturer
has no remedy at law because of his inability to prove special damage,
are not the subject of equitable cognizance, and their future publication
cannot be restrained by injunction.

*Marlin Fire Arms Co.* v. *Shields*, 68 App. Div. 88, reversed.

(Argued May 5, 1902; decided June 10, 1902.)

APPEAL from an order of the Appellate Division of the
Supreme Court in the first judicial department, entered
January 27, 1902, reversing a judgment in favor of defend-
ant entered upon a decision of the court on trial at Special
Term sustaining a demurrer to the complaint.

The nature of the action and the facts, so far as material,
are stated in the opinion.

*John S. Wise* and *H. A. Wise* for appellant. The com-
plaint does not state facts sufficient to constitute a cause of
action at law. (*Kidd* v. *Horry*, 28 Fed. Rep. 766; *Tobias*
v. *Harland*, 4 Wend. 537; *Le Massena* v. *Storm*, 62 App.
Div. 150; *Kennedy* v. *Pub. Co.*, 41 Hun, 422; *Bosi* v.
*Herald Co.*, 33 Misc. Rep. 622; *Dooling* v. *B. P. Co.*, 144
Mass. 258.) If the complaint does not state facts sufficient to
constitute a cause of action at law, the facts stated do not con-
stitute a cause of action in equity. (*Herricks* v. *Toole*, 29
Mich. 340; *Magniac* v. *Thompson*, 15 How. Pr. 299; *S.
Inst.* v. *Makin*, 23 Me. 360; *O'Reilly* v. *N. Y. El. Co.*, 148
N. Y. 353; 1 Pom. Eq. Juris. 320; *Brandreth* v. *Lance*, 8
Paige, 23; *N. Y. J. G. Soc.* v. *Roosevelt*, 7 Daly, 188;
*Mauger* v. *Dick*, 55 How. Pr. 132; *S. M. Co.* v. *D. M. Co.*,
49 Ga. 73.) Equity cannot enjoin a publication by one indi-
vidual concerning the property of another individual. (*P.
A. Co.* v. *Knott*, L. R. [10 Ch. App.] 142; *Kidd* v. *Horry*,
28 Fed. Rep. 776; *B. D. Co.* v. *F. M. Co.*, 114 Mass. 69;

*B. C. W. Co.* v. *Bemis,* 29 Fed. Rep. 95 ; *Mayor, etc.,* v. *J. S. Assn.,* 47 N. J. Eq. 519 ; *Francis* v. *Flinn,* 118 U. S. 385 ; *Whitehead* v. *Kitson,* 119 Mass. 484 ; *N. Y. S. Society* v. *Roosevelt,* 7 Daly, 188 ; *Brandreth* v. *Lance,* 8 Paige, 24 ; *Mauger* v. *Dick,* 55 How. Pr. 132.)

*Charles Gibson Bennett* for respondent. A continuing scheme of blackmail, which has caused and will continue to cause money damage by loss of business, may be enjoined as a wrongful course of conduct or acts which constitute a taking of property. (*S. P. & P. Co.* v. *Delaney,* 48 App. Div. 623 ; *Murdock* v. *Walker,* 152 Penn. St. 595 ; *McCandless* v. *O'Brien,* 8 Lanc. [Penn.] 254 ; *Emack* v. *Kane,* 34 Fed. Rep. 46 ; *Casey* v. *C. T. Union,* 45 Fed. Rep. 135 ; *C. S. & W. Co.* v. *Murray,* 80 Fed. Rep. 811 ; *A. S. & W. Co.* v. *W. D. Co.,* 90 Fed. Rep. 608 ; *U. S.* v. *Kane,* 23 Fed. Rep. 748 ; *Vegelahn* v. *Guntner,* 167 Mass. 92 ; *Beck* v. *R. T. P. Union,* 118 Mich. 497.) The Supreme Court has the power to restrain the publication of false and malicious statements which injuriously affect property and property rights. (*Gee* v. *Pritchard,* 2 Swanst. 428 ; *Wetmore* v. *Scovell,* 3 Edw. Ch. 515 ; *Pope* v. *Curl,* 2 Atk. 341 ; *Horry* v. *R. T. P. Co.,* 57 N. Y. 119 ; *Croft* v. *Richardson,* 59 How. Pr. 356 ; *Emack* v. *Kane,* 34 Fed. Rep. 46 ; *Bell* v. *S. Mfg. Co.,* 65 Ga. 453 ; *Meyer* v. *Devries,* 64 Md. 532 ; *Beddon* v. *Beddon,* L. R. [9 Ch. Div.] 89 ; *Dixon* v. *Holden,* L. R. [7 Eq.] 488.)

PARKER, Ch. J. The plaintiff corporation, which manufactures Marlin repeating rifles, brought this action to perpetually restrain defendant, the proprietor of a magazine called " Recreation," from publishing " any article or statement in any form or under any guise falsely attacking, misrepresenting or depreciating plaintiff's said rifle or its accuracy, effectiveness, merit or value."

Defendant demurred to the complaint, and the question presented on this review is whether it states a cause of action. The following is as brief a synopsis of it as will suffice to present fully the question before us :

25

Plaintiff is engaged in the manufacture and sale of the Marlin repeating rifles, which have become well known as a distinct model throughout the United States and elsewhere, and for some time it advertised the rifles in defendant's magazine. Defendant having advanced his rates, plaintiff withdrew the advertisement, whereupon defendant published letters, purporting to be from correspondents, reflecting on the rifle, such publications taking place, one in March and two in October, 1899, and one in September and another in November, 1900. These letters were not in fact written by correspondents, but were sham letters, written and published by defendant in furtherance of a design to force plaintiff to advertise with him, or, failing in that, to gratify his malice.

The first letter was complimentary to the Marlin rifle throughout and contained an expression of surprise that its advertisement no longer appeared in " Recreation," and the same issue contained an answer by the editor in which the reason for the disappearance of the advertisement was stated to be an advance in advertising rates because of increase in circulation, which advance plaintiff refused to pay, and the complaint alleges that the reason assigned by the editor for the absence of the advertisement and the statement as to its circulation are false.

The first of the two letters in the October (1899) issue purports to be written from Montana and in it the writer says: " I have owned and used a great many Winchester and Marlin rifles of all models.  *  *  *  I have come to the conclusion that the Marlin is not to be compared with the Winchester as regards ease, rapidity or certainty of action, beauty of outline, finish, and all that goes to make up a first class weapon. I consider the first model Winchester a more reliable weapon than the latest Marlin. Some one will ask, Why? And I answer: Because they handle the cartridges perfectly, and as rapidly as the lever can be worked by the operator, under any circumstances; while the Marlin might fail to handle the cartridges if handled with one half the rapidity of the Winchester.  *  *  *  *The Marlin has a faulty extractor and ejector.*" (Citing instances in his own

experience in support of his assertion and specifying what the Marlin lacks.) The letter concludes: " Here is an extract from a well-known Northwestern gun dealer's catalogue which has been in circulation several years: ' I do not manufacture, recommend or guarantee Marlin rifles. If they chew up the heads of cartridges, clog up in the action and magazine it is not my fault; so do not ship them back on my hands. I have Marlin rifles for sale for those who want them, but when sold and delivered my responsibility ceases.' A good advertisement, truly. I consider any gun that leaves the Winchester factory perfect in every respect, both as regards accuracy and manipulation." The statement that " the Marlin has a faulty extractor and ejector" is alleged to be false, and reasons are given in support of the allegation.

The other letter in that issue contained the following: " Were the Winchester people to take the '86 model frame and make it light for a .38–55 barrel and then have a .38–55 Marlin barrel fitted, it would in my opinion be the ideal gun for general work for the man who cannot afford a .30–30 or other late arm. I've used Marlins a good deal and was always bothered by *the side ejector. It is no good,* and the extractor in the Marlin is a little weak." The complaint charges that the statement in this letter that " the side ejector is no good" is false, and further that " the side ejecting system as used by plaintiff is one of the most important improvements of recent development in the art as shown by plaintiff's successful usage in all of its repeating arms made during the last eleven years."

The letter in the September number, 1900, purporting to be signed by Percy C. Bowker of Wakefield, Mass., states that while out squirrel hunting with a friend named Ripley, the latter said his rifle had worn out, and on examination they found that " *the little racker that racks the carrier had worn out* " after " *the rifle had been fired about* 800 *times.*" Ripley took the gun to a dealer who said he did not warrant the Marlin rifle. The letter compared the Winchester with the Marlin favorably to the former, and stated that the

writer did not want the "so-called improvement" in the Marlin, the solid top and side ejector, and expressed the opinion that there is room for great improvement in the Marlin action. The complaint alleges that the statement in this article that "the little racker that racks the carrier had worn out" after "the rifle had been fired about 800 times" is false, and in support thereof further alleges that "the piece referred to is solidly and substantially designed to perform its functions. These parts are made of excellent material, carefully inspected and tested. Similar rifles that have seen years of hard service and been fired many thousands of times, show no considerable wearing at this time. It would be impossible to wear out the part in the manner and time stated."

The publication of November, 1900, purported to be from a correspondent and stated, in substance, that the Marlin is handsome but its place is at the bottom of a list of rifles; "no repeating rifle can handle the long rifle cartridges;" the Marlin extractor is defective; the twist in the barrel is too short and in a specified gun the carrier became worn out before 500 cartridges were used, which gun also shed gas into the action. These statements the complaint alleged to be false, and assigns reasons at length in support of the allegation.

The complaint further alleges that the statements in such several letters have greatly injured the plaintiff in its business of manufacturing and selling its rifles and have "caused it to lose sales of same to a large extent, but to what extent plaintiff is unable to state." It alleges on information and belief that the defendant intends to carry on said scheme and to continue to publish in its magazine false and unfounded statements, calculated to slander and depreciate the accuracy, effectiveness, general merits and value of plaintiff's rifle. It neither asks nor seeks any relief at law for any past publication, but alleges that the plaintiff has no adequate remedy at law, and prays equitable aid by way of an injunction, in order to avoid a succession of suits and also "because of the impossibility of ascertaining, identifying or establishing, according to legal principles, any measure of damage," and

demands judgment against defendant that he "be perpetually enjoined and restrained from publishing, or causing or permitting to be published, in his said magazine or elsewhere, any article or statement in any form or under any guise falsely attacking, misrepresenting or depreciating plaintiff's said rifle or its accuracy, effectiveness, merit or value, and generally restraining and enjoining the defendant from continuing to carry out its said wrongful and illegal scheme to force the plaintiff again to advertise its rifle in defendant's said magazine."

As the demurrer to the complaint necessarily assumes that all of the facts alleged therein are true, it must be treated as an established fact that the articles published in defendant's magazine were not written by real correspondents, but by defendant himself, and the natural inclination of all fair-minded men, charged with the responsibility of administering the law, would be to relieve the plaintiff from the annoyance to which it is subjected from wholly unworthy motives, as we must further assume. But equity does not undertake to relieve from *all* the annoyances caused by those who are inconsiderate of the feelings and business interests of others. On the contrary, it is a general rule, which has some exceptions, that it will not undertake to interfere where a party has an adequate remedy at law and when it does interfere it is guided by principles of equity, which during the long course of its administration have become established.

Concededly there is no precedent in the courts of this state for the interference of equity in a case of this character. Hence it becomes necessary to examine the complaint in the light of the established principles for the purpose of ascertaining whether it states a cause of action.

It should be noted, first, that this complaint contains no allegation of any statement made against the character or conduct of plaintiff. It has not been libeled. The words published in defendant's magazine, and for which defendant is responsible whether written by him or another, criticise the gun manufactured by plaintiff. They do not charge that

plaintiff was guilty of any deceit in vending, or want of skill in manufacturing the gun. Every statement published and of which complaint is made relates solely to the quality of plaintiff's rifles and their relative desirability as compared with rifles manufactured by others.

Now, it has been the law of this state since the decision in *Tobias* v. *Harland* (4 Wend. 537), in which the opinion was written by Judge MARCY, that "when the words are spoken, not of the trader or manufacturer, but of the quality of the articles he makes or deals in, to render them actionable *per se*, they must import that the plaintiff is guilty of deceit or mal-practice in making or vending them." Where the libel or slander is of a manufactured article and does not directly impeach the integrity, knowledge, skill, diligence or credit of the plaintiff, the words are not actionable at law unless special damage be alleged and proved, and a " general allegation of loss of customers is not sufficient to enable the plaintiff to show a particular injury."

The complaint in this action not only fails to contain alle-gations of special damage, but it in terms specifically nega-tives the claim of special damage by alleging that it is unable to state to what extent it has been injured by said publications.

Among the more recent cases in which the doctrine of *Tobias* v. *Harland* has been recognized and followed are :

*Le Massena* v. *Storm* (62 App. Div. 150), in which the court said : " When the slander is of a property right or title or of a thing, falsity of utterance, malice and special damage flowing or resulting necessarily or naturally as the proximate consequence must be alleged and shown by the plaintiff, except in those cases where the slanderous words also impute to the owner dishonesty, fraud, deception or other misconduct in his trade or business in connection with the property."

*Kennedy* v. *Press Pub. Co.* (41 Hun, 422) in which the court said : " It is settled by authority that a libel on a thing is not actionable unless the owner of the thing alleges and proves that he has sustained pecuniary loss as a necessary con-sequence of the publication."

*Dooling* v. *Budget Pub.' Co.* (144 Mass. 258) in which the court said : " Words relating merely to the quality of the articles made, produced, furnished or sold by a person though false and malicious, are not actionable without special damage."

We need not stop to consider the reason for the rule for it has been too long and too firmly established to admit of questioning at this day.

The plaintiff's first excuse for invoking the aid of equity — to avoid a multiplicity of actions at law — is evidently not well founded, for plaintiff has not only failed to state facts sufficient to constitute *one* action at law, but it has affirmatively stated facts which show that it has *not* an action at law. In such a situation it goes without saying that a court of equity cannot be invoked to aid a plaintiff unless some other ground for its interference be shown.

Another ground of equity alleged is that plaintiff has no adequate remedy at law " because of the impossibility of ascertaining, identifying or establishing, according to legal principles, any measure of damages." That he has no adequate remedy at law is true, for, as we have seen from an examination of the authorities, his complaint indicates that he has no remedy at law whatever.

This brings us to the real question of the case, whether an unjust and malicious criticism of a manufactured article, for which the manufacturer has no remedy at law because of his inability to prove special damage, is the subject of equitable cognizance.

The constitutional guaranty of freedom of speech and press, which in terms provides that " every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right ; and no law shall be passed to restrain or abridge the liberty of speech or of the press " (State Constitution, art. I, § 8), has for its only limitations the law of slander and libel.   Hitherto freedom of speech and of the press could only be interfered with where the speaker or writer offended against the criminal law or where the words

amounted to a slander or libel of a person or· corporation or their property, and the guaranteed right of trial by jury entitled the parties accused of slander or libel to have twelve men pass upon the question of their liability to respond in damages therefor and to measure such damages. But the precedent which the plaintiff seeks to establish would open the door for a judge sitting in equity to establish a censorship not only over the past and present conduct of a publisher of a magazine or newspaper, but would authorize such judge by decree to lay down a chart for future guidance in so far as a plaintiff's property rights might seem to require, and, in case of the violation of the provisions of such a decree, the usual course and practice of equity would necessarily be invoked, which would authorize the court to determine whether such published articles were contrary to the prohibitions of the decree, and, if so found, punishment as for a contempt might follow. Thus a party could be punished for publishing an article which was not libelous and that too without a trial by jury.

While we have pointed out in general terms the limitations of the courts in dealing with slander and libel, we shall confine ourselves on this review to a consideration of those authorities which bear directly upon the question whether equity, which creates neither rights nor liabilities, has heretofore assumed jurisdiction to restrain the publication of criticisms unjustly affecting the merits of articles of property belonging to a plaintiff when such publication will not support an action at law, for, if such precedent be not already established by the courts of this state, in our view it ought not to be.

It was long ago held in this state that a Court of Chancery has not jurisdiction to restrain the publication of a libel, by injunction, upon a bill filed by a party whose character or business will be injured by the publication. (*Brandreth* v. *Lance*, 8 Paige, 24.)

In Eden on Injunctions (3d ed. page 372) it is said : "There is, perhaps, but one instance in the books, of any judge having maintained the existence of a power in the Court of Chancery of restraining publications on any other ground but that of

property and copyright; and it was then done in language so strange and unconstitutional, as to carry on its face its own refutation."

In *Singer Mfg. Co.* v. *Domestic S. M. Co.* (49 Ga. 70) the court said : " It is well settled that an injunction will not be granted to restrain slander or libel of title or of reputation." (Citing cases.)   " Not that it is not wrong, not that the wrong may not be irreparable, but simply because Courts of Chancery, in the exercise of the extraordinary powers lodged in them, have uniformly refused to act in such a case, leaving parties to their remedy at law."

In *Mauger* v. *Dick* (55 How. Pr. 132) it is said: " The jurisdiction of a court of equity does not extend to false representation as to the character or quality of plaintiff's property, or to his title thereto, when it involves no breach of trust or contract, nor does it extend to cases of libel or slander. * * * If the plaintiff has any remedy it is by action at law." (See, also, Pomeroy's Eq. Jur. § 320, note 3 ; *Mulkern* v. *Ward*, L. R. [13 Eq. Cases] 619 ; Kerr on Injunctions [2d Am. ed.], p. 377 ; High on Injunctions [3d ed.], § 1015 ; Beach on Injunctions, Vol. 1, p. 73.)

In *Kidd* v. *Horry* (28 Fed. Rep. 773) application was made to Mr. Justice BRADLEY for an injunction to restrain defendants from publishing libelous circulars concerning plaintiff's business and patent rights pending the trial of the principal suit brought to restrain infringement of patents. The learned justice said : " The application seems to be altogether a novel one, and is urged principally upon a line of recent English authorities." (Citing cases.)   " An examination of these and other cases relied on convinces us that they depend on certain peculiar acts of the Parliament of Great Britain, and not on general principles of equity jurisprudence."   After commenting upon the English statutes he further says: " But neither the statute law of this country nor any well-considered judgment of the courts has introduced this new branch of equity into our jurisprudence.   There may be a case or two looking that way, but none we deem of sufficient authority to justify

us in assuming the jurisdiction." (Citing cases in this state and other states in support of the proposition.)

To the same effect are *Baltimore Car Wheel Co.* v. *Bemis* (29 Fed. Rep. 95); *Mayer* v. *Journeymen Stonecutters' Assn.* (47 N. J. Eq. 519), which was an application to the chancellor to restrain the circulation of libelous matter, and *Francis* v. *Flinn* (118 U. S. 385), in which the bill prayed an injunction against sundry things done by defendants against plaintiff's pilot boat, among other things false publications. Mr. Justice FIELD said : " The bill does not state what the publications were.  *  *  *  If the publications in the newspapers are false and injurious he can prosecute the publishers for libel. If a court of equity could interfere and use its remedy in such cases, it would draw to itself the greater part of the litigation properly belonging to courts of law."

Our attention is not called to any decisions in this state in suits founded solely on slander or libel for which an action at law could not be maintained, holding a contrary doctrine, nor to any text writers differing from those cited.

In *Hovey* v. *Rubber Tip Pencil Co.* (57 N. Y. 119) the action was one of libel and it was sought therein to restrain defendant's publication wherein it claimed to be the owner of valuable rights secured by letters patent, but the only question decided by the court was, that the court below had rightly determined that the action was not one within its jurisdiction ; and the case is authority for no other proposition.

*Croft* v. *Richardson* (59 How. Pr. 356) is a Special Term decision which seems not to have received very careful consideration, but even in that case a cause of action for libel upon property was stated.

The case of *Vegelahn* v. *Guntner* (167 Mass. 92) was a bill against fourteen individuals and a trade union and it alleged conspiracy. There was no question of libel involved, but instead, an injunction was sought against patroling in front of plaintiff's premises, threatening with violence those willing to be employed, etc., the object of the plaintiff being to check-mate a conspiracy to prevent him from getting workmen.

*Beck* v. *Ry. Teamsters' Pro. Union* (118 Mich. 497) was a boycott case and enjoined " picketing, and distribution of boycotting circulars and all acts of intimidation and coercion." It recognized, however, the general principle, that an injunction will not ordinarily issue to restrain an individual from publishing a libel where there is no conspiracy, no intimidation and no acts of coercion.

*Casey* v. *Cin. Typ. Union No. 3* (45 Fed Rep. 135) was an action brought for the purpose of checkmating an alleged combination or conspiracy by a trade union to boycott a newspaper for refusing to unionize its force, which combination was held to be unlawful by Judge SAGE of the U. S. Circuit Court, and as an incident to the relief granted he enjoined the publication and circulation of posters, handbills and circulars, printed and circulated in pursuance and in aid of such combination or conspiracy to boycott.

We do not express any views upon either one of the three decisions which aimed at the restrainment of those who were engaged in boycotting, for it quite sufficiently appears that whatever may be their value as decisions they are not in point in this controversy, for the question was not up for consideration, whether the publication of an alleged libel upon property which did not result in damages which could be proved should be restrained. There were more important questions involved in the disposition of those cases than whether the circulation of libelous matter could be enjoined, the latter being a mere incident brought in with everything else that it was deemed necessary to enjoin in order to break down the boycott.

*Emack* v. *Kane* (34 Fed. Rep. 46), which is a decision by a single judge, seems to be authority in support of plaintiff's contention. A very careful examination of it, however, leads to the conclusion that its attempt to overthrow the reasoning of Mr. Justice BRADLEY in *Kidd* v. *Horry* (*supra*) was not successful.

Our conclusion from a review of the authorities, therefore, is, that all well-considered decisions agree in determining it

to be the law that a court of equity has not jurisdiction to grant the relief to secure which this suit was brought.

The order of the Appellate Division should be reversed and the judgment of the Special Term affirmed, with costs in all courts.

GRAY, O'BRIEN, CULLEN and WERNER, JJ., concur; BARTLETT and HAIGHT, JJ., dissent.

Ordered accordingly.