Spear, C. J.
Manifestly the crucial question in the case is whether or not the comment respecting the play called “The Labyrinth,” connected with the statement that Miss Néthersole “had hysterics,” "was libelous per se. One assumption in support of the affirmative of this question is that the article was directed against the plaintiff below,while the contrary claim is that it was directed against the play — the thing itself. Was it directed against the plaintiff? The article is entirely free *128 from anything like a libelous attack upon Miss Nethersole. True, she is referred to, and it is stated that she had hysterics. That a woman has fainted, or has had hysterics, is so common an occurrence that a statement to that effect, though untrue, (and the legal effect of the record is that it was in this case untrtie), falls far short of being a libel per se upon such woman, and, leaving that reference to the plaintiff out, the statement is at once but a statement that the play was soundly hissed in London, which was also untrue. As tersely stated by counsel for defendant below; “It” (the article) “has no reference whatever tc Miss Nethersole; it does not say that she is not qualified for her profession; it does not say that Miss Nethersole was received frigidly in Cleveland; it does not say that Miss Nethersole was hissed in London. It says that the play ‘The Labyrinth’ was received frigidly in Cleveland; it says that the play ‘The Labyrinth’ was hissed in London.” Besides, the record, shows that Miss Nethersole was not charged with any lack of character, or of womanliness as a woman; and the court as we understand it found as a' fact, that there was no charge or imputation against her as a woman.
It is, however, claimed that the alleged libel was against her in her profession or business. Here, again, the record contradicts the claim. She was not charged with any lack of ability or character as an actress, nor with any lack of ability or df good judgment as a manager; indeed no’ref-' ererice whatever to her conduct or management in either respect was had, the court having distinctly *129 so found and held. The case, therefore, presented a situation where the evidence afforded no ground for an allegation of actual malice, and no ground for a claim that the plaintiff had, by reason of the publication, been subjected to public disgrace, contempt or ridicule, and where the only part of the article which was found to be libelous per se could not be considered as evidence of express malice in respect to criticisms otherwise not unfair or unreasonable. The learned judge held that the balance of the article was not of itself unfair, or unreasonable, and therefore not libelous.
How, then, could the article be treated as a libel upon Miss Nethersole? It is alleged that by reason of this article she has suffered mental distress. Quite likely. But is that a test of whether the article is against her rather than exclusively against the plays? No person, man or woman, can witness sharp criticism of his or her own production, play, book, song or what-not, without more or less mental discomfort, and possibly, in a remote way, some trivial loss. Take a familiar event as an example. Recently there appeared before the American public, on the lecture platform, and in other public places perhaps, a somewhat noted navigator offering - certain proofs of his claim that he had discovered the north pole. Newspapers and scientific journals commented severely upon the proofs, seeking to show that they were bogus. Undoubtedly the navigator felt much distress, and it is quite likely that many people thought less of him because of those attacks, but does that afford any reason for saying that the attack was upon the man ? And though the writer *130 of such criticism had, in some non-essential particular, been mistaken as to a fact, would that show, that the attack was on the navigator rather than on the proofs, and give an action as upon a libel per se? It would seem not. And is fair criticism of proofs of an exhibition to be penalized because it may cause some distress or even loss of profits to the exhibitor, especially where the amount of such loss might thereby be saved to the public?
Although the distinction between a libel upon a person and a libel upon that which is the property of a person, is somewhat nice, and although in many cases the distinction is not easy to demonstrate, it often being difficult to apply the settled rules of law to the particular facts of the case, and although the decisions illustrating the subject are not altogether consistent, one with another, yet the rule seems to be well established to the effect that while by the law of libel defamatory language is actionable without special damage when it contains a damaging imputation against one as an individual, or in respect to his office, profession or trade, it is not actionable when it is merely in disparagement of one’s property unless it occasions special damage. Illustrations of the principle are found in text-books and in a number of reported cases, a few only of which will be here cited. In Tobias v. Harland, 4 Wend., 537, being a slander suit for uttering words injurious to a manufactured article, the court held that “where the words are spoken-not of the trader or manufacturer, but of the quality of the article made or dealt in, to *131 render them actionable per se, they must import that the plaintiff is guilty of a deceit or malpractice in the making or vending, or of want of skill in the manufacturing of the article,” Marcy, J., stating in the opinion that “no instance can be found, I believe, where an action has been sustained on words for misrepresenting the quality of any single article which a person has for sale, unless special damages are alleged and proved.” The holding in Young v. Macrae, 113 C. L. R., 264, (a libel suit), is to the effect that if a person falsely and maliciously disparages an article which another manufactures or vends, and special damage results, an action will lie although no imputation is cast on the personal or professional character of the manufacturer or vendor, the plain inference being that unless special damage results no- recovery could be had. In Dooling v. Budget Pub’g. Co., 144 Mass., 258, it is held that the publication of an article stating that a dinner furnished by a caterer on a public occasion was “wretched,” and “was served in such a way that even hungry barbarians might justly object,” is not actionable without proof of special damage. In Kennedy v. Press Pub. Co., 41 Hun, 422, it is held that an article severely reflecting on a Coney Island saloon was a libel on the place and not on the proprietor, and, in the absence of any averment of special damage, the facts stated did not constitute a cause of action. Townsend, in his work on slander and libel, sec. 130, observes: “Whether the libel concerns a person or thing, i. e., the affairs of a person, is material in this respect: that language *132 when it concerns a person and is discommendatory, is always, in the absence of any evidence to the contrary regarded as uncalled for, as published without any lawful excuse, and is not to be believed and considered as true unless its truth be established, or, as the phrase is, such language is presumed to be malicious and false. But if it is language concerning a thing, no such presumption is indulged, and upon those who allege language concerning a thing to be false and malicious is the burden of establishing those conclusions by other evidence than that afforded by mere production of the language. And besides, to give a cause of action for language concerning a thing, damage, general or special, must in all cases be alleged and proved.” In Marlin F. A. Co. v. Shields, 171 N. Y., 384, Parker, C. J., after reviewing Tobias v. Harland, Kennedy v. Press Pub. Co., and Dooling v. Budget Pub'g. Co., heretofore cited, and Le Massena v. Storm, 62 App. Div., 150, (a suit in slander), all to the effect that “words relating merely to the quality of the article made, produced, furnished or sold by a person, though false and malicious, are not actionable without special damage,” adds: “We need not stop to consider the reason for the rule for it has been too long and too firmly established to admit of question at this day.” The holding in the instance case is that “unjust and malicious criticisms of a manufactured article, published in a magazine, for which the manufacturer has no remedy at law because of his inability to prove special damage, are not the subject of equitable cognizance, and *133 their future publication cannot be restrained by injunction.” Reference to other cases of like import, cited by counsel for plaintiff in error, will be found in the Reporter’s notes.
A not unimportant consideration pertinent to the general subject is that of so-called privilege. It rests upon that clause of our Bill of Rights, section 11, which provides: “Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press.” Then follows that which relates to criminal prosecutions for libel, to the effect that if the matter charged as libelous is true, and is published with good motives, and for justifiable ends, the party shall be acquitted. The liberty thus given is to publish truth with good motives and for justifiable ends, and this is so whether the publication affects government, property or individuals. Not that this implies a distinction as to limitation of right between a newspaper publisher and any other individual, for the publisher is not, at common law, privileged as such in the dissemination of news, but is liable for what he publishes in the same manner as any other individual. But it is not to be inferred that the publisher is subject to any severer rule as to liability. Townsend on Libel, sec. 252. Hence it follows, as held in Henwood v. Harrison, 7 L. R. C. P., 606, that “the fair and honest discussion of or comments upon a matter of public interest is in point of law privileged, and is not the subject of an action, unless the plaintiff *134 can establish malice.” The rule is more fully stated by Gray, C. J., in Gott v. Pulsifer, 122 Mass., 235: “The editor of a newspaper has the right, if not the duty, of publishing for the information of the public, fair and reasonable comments, however severe in terms, upon anything which is made by its owner a subject of public exhibition, as upon any other matter of public interest; and such a publication falls within the class of privileged communications for which no action can be maintained without proof of actual malice.” A recent text-writer indicates an opinion that the word “privileged” means that the words are not defamatory — that criticism is no libel. Newell on S. & L., p. 566. Either construction vindicates the right. See, also, the comments of the author on the general subject on pages 567 and 586. See, also, comments of Townsend, in his work on libel, sec. 252. Also' Folkard’s Starkie, secs. 255 and 256.
Attention is called to Mauk v. Brundage, 68 Ohio St., 89, as justifying the ruling below. We think that case so essentially different as to afford but little, if any, light. The publication directly concerned acts, practice and treatment of his patients by the party as a physician, and so affected him injuriously in his business; in no sense was it a libel upon his property. Nor do we find any Ohio case on an exact parallel with the case at bar. Davis v. Brown, 27 Ohio St., 326, was for defamation of a person. The court held that to be actionable words must import either a qharge of an indictable offense involving moral turpitude or *135 infamous punishment; or impute some offensive or contagious disease calculated to deprive a person of society; or tend to injure him in his trade or occupation; each class affecting and confined to defamation of the person. That isn’t our case. The other Ohio cases cited by the counsel, each and all, involve charges against or defamation of, the person; not one of the charges is directed against property. Among the cases specially referred to by counsel is that of The State v. Smily, 37 Ohio St., 30. That was a criminal prosecution upon an indictment charging the defendant with having falsely and maliciously published of another that his house had been searched, under legal process, for the discovery of goods recently stolen, and supposed to be there secreted. This court held the publication to be a libel. There is a discussion in the opinion as to certain distinctions that exist between words spoken and the same words written and published. These distinctions are recognized by the text-writers and by certain decisions, but as we do not rest our conclusion wholly or mainly on cases in slander, but principally upon cases in libel, it is not necessary to pursue the reasoning upon which those distinctions obtain. As to this criminal case, it is .enough to say that it concerns the person only, and, in its facts, there is no sort of resemblance to the case at bar. We have felt it safer to adhere to what we conceive to be the well established rules respecting actions of this general character rather than seek to extend or enlarge them, and in this course we but follow the policy of decisions beginning with Wilson v. Rob *136 bins, Wright, 40, followed by Alfele v. Wright, 17 Ohio St., 238, and of Davis v. Brown, supra, where comment in both the other cases is quoted ■to the effect that: “We feel neither disposed nor authorized to extend the innovation.” It is true that- these three cases were actions in slander, and that the innovation demanded was the application to words uttered concerning a man rules regarding liability which had been held to apply to words pttered, concerning a. woman, but we are unable to perceive why any distinction should be made as to the matter of policy itself.
It is urged by the learned counsel for defendant in error that this court should look beyond the part held by the trial court as libelous and consider the entire article in determining whether at the conclusion of all the evidence a verdict should have been directed. We agree with this claim and have examined and considered the entire record. Such consideration,' however, leads to the conclusion that the excluding from the jury of certain parts of the article, being all that part except the paragraph herein before quoted as part of the charge to the jury, save for such use as may be pertinent .for an understanding of the statement of “The Labyrinth” ■ being received frigidly in Cleveland and hissed, in London, was entirely proper as is shown by the learned judge’s opinion, which well justifies the withdrawal. A synopsis of it here follows:
There is nothing’in the article, says the judge, which reflects disparagingly upon Miss Nether-sole’s private character or which tends to subject *137 her to public disgrace, contempt or ridicule, the case proceeding only on the claim that she had suffered injury to her business and profession. When one offers a production or performance for public exhibition, he submits it to fair and reasonable criticism, and unless the writer passes beyond the limits of such criticism his language cannot be held to be libelous. Whether or not the falsity of such a statement tends to prove express malice need not be considered here, for even though the statement as to the hissing of “The Labyrinth” in London be untrue, it cannot be considered as evidence of express malice in respect to criticism which is otherwise fair and reasonable. The plays all treat of illicit relations between the sexes. They all present situations which suggest the yielding to animal passions. The life which they represent is not according to the universally accepted standards of morality and decency of conduct. It may be that intelligent and right-minded persons may take different views as to the tendency of such plays, and as to the policy of presenting them. Some may say that the picture of the consequence of an evil life will deter people from entering upon such a life. Others may say that such a representation gives knowledge of evil and suggests thoughts which tend to wrong-doing. Still others may say if a play represents any phase of life it should be judged wholly as a work of art. There may be honest and fair criticism from either standpoint. The true test is whether the description of the plays is fairly given, and whether the opinions expressed are such as mav *138 be reasonably entertained and expressed by an honest person. Judged by this test there can be no doubt that the criticism complained of is fair and reasonable, and the case is not oné where different minds may properly arrive at different conclusions in respect to its fairness and reasonableness.
For these and cognate reasons his honor excluded from the jury all parts of the article tc which he had called attention except for such use thereof as may be pertinent for understanding the statement respecting the hissing of “The Labyrinth” as hereinbefore quoted. Then followed a holding to the effect that the context showed that the play was so received on account of its character as described in the article, and that the statement was not privileged, if untrue.
■ This opinion makes clear the narrow margin of support there is for any recovery of damages in the case. It rests wholly on the theory that if any possible damage, however remote or slight, can be imagined as coming to the owner of property by a libel upon such property, a case is made for an inquiry of damages generally by the jury, though no special damage be alleged or proven, and although the published words do not, as found by the trial court, naturally tend to expose the person concerning whose property the same were published, to public hatred, contempt or ridicule, or deprive her of the benefits of public confidence or social intercourse. A conclusion which utterly obliterates and destroys the distinction as affecting the establishment of damages between a libel upon *139 the person and a libel upon the property o£ such person, while, at the same time, it allows nothing by way of privilege or duty to the public.
Upon the question of actual malice, the record shows that the gentleman who was the editor of the paper and was vice-president of the Company, on the stand testified to the effect that no malice ■existed on the part of defendant, showing that neither he nor the others of the managers had any ill-will toward the plaintiff, nor did the witness know of that article before it was published. The dramatic critic, upon the stand, disclaimed any • ill-will toward the plaintiff and any intent to injure • her. He testified, also, that when he wrote the article, that relating to “The Labyrinth” as well as the other parts, he believed all to be true; that he had been told of the London incident by a man connected with the stage, and had also seen a dispatch, or cable, from London telling of the same incident. No evidence was offered in contradiction of this testimony, or to establish otherwise the charge of actual malice, and the conclusion is justified that the accusation as to actual malice failed. We suppose the rule to be well established • that while malice is implied if the publication be per se libelous, yet if not, and malice is alleged, -the charge must be supported by evidence. We have, therefore, a case where there is a published criticism of that which is the property of a person, without the presence of actual malice, and without ■proof of special damage. By force of the authorities, and upon reason, we hold that such a case presents no ground justifying a verdict in dam *140 ages. To hold otherwise would be to ignore the rulé respecting libels against property shown by a long line of decisions, a few only of which have been heretofore cited.
Counsel argue that the plaintiff below was entitled to ' special consideration because she is a woman, and cite the chivalrous language of Read, J., in Malone v. Stewart, 15 Ohio, 321. That language was manly and appropriate in that kind of a case (which involved a gross slander upon a woman), but we think is out of place as applied to this case. Of course, the plaintiff below had the same right to considerate and decorous treatment as a man in'a like situation would have had and a just and reasonable award of damages if any special damage had been proven, but the matter being strictly a business enterprise she could have no superior right. The case was given to the jury in a way to permit them, with no proof of special damage, and almost without guide as to any damage, to wander at will and return such sum as imagination might conjure up, and the amount of the verdict itself, which was criticised by the trial judge himself as to amount, shows a lamentable want of comprehension of the real case submitted. It is a pregnant and significant instance of the great risk of giving to juries unlimited range in contentions of this kind. Remembering, however, that the plaintiff was present at the trial, and on the stand as a witness, it isn’t any wonder that, giving way to the charm of a talented and captivating woman, the jury inclined to reach into the till of what they doubtless considered “a *141 soulless corporation,” and return a sum one-fifth of which would have been thought adequate had the complaining party been a man. It is no answer to say that newspapers often exceed the bounds of fairness and decency in comments upon people, and their private affairs. Every intelligent reader knows that some papers do, and cause great distress and wrong thereby, but others are scrupulous and careful. Nor can it be denied that the press owes a duty to its readers in regard to its notices of the theater and plays therein presented. The theater is, in a sense, a public institution; that is, it is a place to which the public at large is invited subject to such regulations as the manager may see fit to adop.t. As yet the press has not been generally excluded, and while its representatives are permitted, to be present and essay notice and criticism of the performances there witnessed, it is not only their privilege but their duty to give truthful accounts, commendatory when justified, deprecatory if required, and while such criticisms are fair and substantially correct, the newspaper is not only not blameworthy, but is thereby rendering a valuable service to the public It will be a sorry day when it becomes a perilous thing for a newspaper to justly characterize as demoralizing many of the plays nightly presented on the boards of our theaters at this time, and it is the duty of the courts to see that the rules of law are not so applied as to discourage just and truthful criticism.
Other errors are alleged by plaintiff in error. It is not necessary to notice all of them. One, how *142 ever, may be referred to, viz: the complaint as tc misconduct of counsel for plaintiff in the closing argument. It consisted of a question put to opposite counsel. We regard the question as a mistake, but, for that matter, the counsel himself seemed to see it in that light at the time and promptly withdrew it. It is proper to add that we think the complaint trivial rather than serious.-
We are of opinion that the motion of the defendant below, at the conclusion of all the evidence to take the case from the jury and render judgment for the defendant, should have been sustained, and that it is .the duty of this court now to render the judgment that the common pleas should have rendered. Judgment of the circuit court and of the common pleas will be reversed and judgment will be entered for the plaintiff in error.

Reversed.

Davis, Price, Johnson and Donahue, JJ., c'oncur.