## VITAGRAPH CO. OF AMERICA v. FORD.

(District Court, S. D. New York. April 23, 1917.)

1. LIBEL AND SLANDER ⬤⇒130—NATURE AND ELEMENTS.
    A book, picture, or play cannot be libeled as such.
    [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 386.]

2. LIBEL AND SLANDER ⬤⇒9(1)—LIBEL AGAINST CORPORATION.
    Written or printed words, to be libelous per se of a corporation, must injuriously and directly affect its credit or property, and necessarily and directly occasion it pecuniary injury.
    [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 80, 90.]

3. LIBEL AND SLANDER ⬤⇒9(1)—LIBEL AGAINST CORPORATION.
    Plaintiff corporation exhibited throughout the United States a motion picture, which it claimed was presented not only for commercial purposes, but to further the propaganda for national defense. Defendant published an article in which, referring to such picture, he asked his readers whether they shook with fear on seeing such picture, and whether they knew that others were shaking with laughter at their fear, and with joy over the fat contracts their fear might bring them, and stated that it was founded on a story by M., that M. was advertising his war munitions, that a company of which he was president had been organized to manufacture such munitions and was engaged in selling stock, that the book was a fine advance notice, and the picture a fine follow-up. The article then attacked munition makers, manufacturers of armor plate, and others as agitating the country, not for patriotic reasons. *Held*, that the article did not merely criticize plaintiff for avowedly advertising M.'s munitions and stocks, which would not have been libelous per se, but charged that it was producing such picture to advertise such stocks by deceptive and disingenuous methods, under cover of a presentation behind which was concealed a mean scheme, and that plaintiff was the hypocritical and deceiving assistant in M.'s dishonorable scheme of advertisement, and was libelous as injuriously and directly affecting the corporation's property and causing it pecuniary injury.
    [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 80, 90.]

4. LIBEL AND SLANDER ⬤⇒86(1)—INNUENDO—OFFICE.
    An innuendo may explain published words, but cannot enlarge them, unless justified by the antecedent facts to which they refer.
    [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 205.]

At Law. Action by the Vitagraph Company of America against Henry Ford. On demurrer by defendant, and motion for judgment by plaintiff. Demurrer overruled, and motion for judgment granted conditionally.

William A. Ulman, of New York City (Elijah N. Zoline, of New York City, of counsel), for plaintiff.

Crisp, Randall & Crisp, of New York City (W. Benton Crisp, of New York City, and Alfred Lucking, of Detroit, Mich., of counsel), for defendant.

MAYER, District Judge. The action is to recover damages of $1,-000,000 for libel, defendant has demurred, and plaintiff has moved for judgment on the pleadings.

Plaintiff is a manufacturer and producer of motion pictures, and in September, 1915, first publicly presented a motion picture called "The

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Battle Cry of Peace," and since then has exhibited this picture throughout the United States and Canada. It is alleged that defendant in May, 1916, caused to be published extensively an article entitled "Humanity—and Sanity." The article commences:

"For months the people of the United States have had fear pounded into their brains by magazines, newspapers, and motion pictures. No enemy has been pointed out"

—thus somewhat lacking in prophetic vision, in view of later events. The article then proceeds in a similar vein, quoting discursively from the Congressional Record, Lew Dockstadter, the minstrel, and various other sources, until it arrives at motion pictures, when the following observations are indulged in:

"The Battle Cry of Maxim.

"Have you seen that awful moving picture, 'The Battle Cry of Peace'?
"Did you shake with fear, and tremble for your country's safety?
"Did you know that others were shaking at the same time, but with laughter at your fear, and with joy over the fat contracts your fear might bring them?
"On the screen you were told that the play was founded on the story of Hudson Maxim, 'Defenseless America.' You saw Mr. Maxim in the picture. He was holding something aloft. It was an instrument of warfare.
"Now, Mr. Maxim was merely advertising his wares and playing on your fears to make a market for his goods.
"Mr. Maxim has something to sell—war munitions.
"The following is from the stock report of Harvey A. Willis & Co., 32 Broadway, New York City, Nov. 13, 1915:
"'The stock of the Maxim Munitions Corporation is the latest candidate for favor among the curb war stocks. It made its appearance this week at 12 and was actively traded in at 12 up to 14½. This company is a $10,000,000 concern recently organized for the purpose of manufacturing munitions of war of all kinds, except explosive materials. * * * The company has arranged to take over the important inventions of Hudson Maxim for the manufacture of aerial torpedoes, bomb-throwing devices, aeroplane guns, etc. Mr. Maxim himself will be president of the company.'
"The book was a fine advance notice. The picture was a fine follow-up. Then came some swift 'patriotic' work.
"Just two weeks later, November 27, 1915, the following appeared on the first page of the New York World:
"'St. Louis, Nov. 26.—Many members have resigned and others are threatening to resign from the Committee of One Hundred appointed by Mayor Kiel to urge the preparedness programme upon Congress. This action resulted from advertisements in St. Louis newspapers this morning of a $10,000,000 Maxim Munitions Corporation offering stock for sale at $10 a share. Hudson Maxim appeared two days ago before the Business Men's League to urge support of the national defense programme. * * *'"

The article then goes on in a lurid way to attack munition makers, manufacturers of armor plate, and others as agitating the country, not for patriotic reasons, but for profit.

Plaintiff alleges that it produced the Battle Cry of Peace, "not only for commercial purposes * * * but also for the purpose of furthering a national propaganda to enlighten the public upon the condition of the country as it was then known, and for the purpose of communicating a great and important message to the American people, with the patriotic end in view of promoting the best interests of the nation." The gravamen of plaintiff's charge is stated in its allegation III as follows:

"III. That the charge made in said article by the defendant was made and tended to convey to the public the impression that the said moving picture 'The Battle Cry of Peace' was produced by this plaintiff at the instance of and in the interest of the said Hudson Maxim or in the interest of manufacturers of steel, powder, arms, ordnance, and munitions of war, and for the purpose of furthering the personal and selfish interests of said manufacturers; and that the charge made in said articles was meant to and tended to convey the impression to the public that the plaintiff was willfully, wickedly, and maliciously attempting to inspire in the public mind the belief that this country stood in great danger in the event of invasion by a foreign foe by reason of its inadequate army and navy and its inability to successfully resist invasion, and that this plaintiff did this from ignoble, dishonest, dishonorable, and treasonable motives. That the charges made in said article by the defendant, and the innuendo which the defendant thereby intended to convey to the public, was and is absolutely false and malicious."

[1] The law is well settled that a book, picture, or play cannot be libeled as such. Odgers on Libel & Slander (4th Ed.) p. 32; Marlin v. Shields, 171 N. Y. 384, 64 N. E. 163, 59 L. R. A. 310; Le Massena v. Storm, 62 App. Div. 150, 70 N. Y. Supp. 882.

[2] It is equally well settled that written or printed words, to be libelous per se of a corporation, must injuriously and directly affect its credit or property, and necessarily and directly occasion it pecuniary injury, and that, unless such are the necessary results of the publication, the words are not actionable per se. In Reporters' Ass'n v. Sun Printing & Pub. Ass'n, 186 N. Y. 437, 79 N. E. 710, Judge Gray said:

"That a corporation has the right to maintain an action of libel, when the publication assails its management, or credit, and inflicts injury upon its business, or property, is a proposition, which is true upon principle and which has the support of authority. See Newell on Slander and Libel, p. 360, and cases cited. It is as much entitled to the protection of the law, in those respects, as is the natural person. It differs from the latter, in that it has no character to be affected by a libel; but its right to be protected against false and malicious statements, affecting its credit, or property, should be beyond question. There has been some dispute in the cases as to the necessity of setting out the specific damage, which a corporation claims to have suffered from a libelous publication; but I regard the better rule to be that such an averment is not necessary, when the language is of so defamatory a nature as to directly affect credit and to occasion pecuniary injury."

To similar effect are Memphis Tel. Co. v. Cumberland Tel. Co., 145 Fed. 904, 76 C. C. A. 436; Union Associated Press v. Heath, 49 App. Div. 247, 63 N. Y. Supp. 96; Kemble, etc., v. Kaighn, 131 App. Div. 63, 115 N. Y. Supp. 809; Philipp Co. v. New Yorker Staats-Zeitung, 165 App. Div. 377, 150 N. Y. Supp. 1044; Reporters' Ass'n v. Sun Printing & Pub. Ass'n, 186 N. Y. 437, 79 N. E. 710; N. Y. Bureau of Information v. Ridgway-Thayer Co., 119 App. Div. 339, 104 N. Y. Supp. 202, reversed on opinion of Ingraham, J., 193 N. Y. 666, 87 N. E. 1124; International Text-Book Co. v. Leader Printing Co. (C. C.) 189 Fed. 86.

[3] The question therefore is: What does this article really mean? Counsel for defendant contend, not without ingenuity, that, at worst, the article can be construed merely as meaning that the picture or photo play is an advertisement of Mr. Maxim's munitions wares and stocks, and that there is nothing unlawful in such an advertisement.

If the premise is correct, the conclusion is sound. Counsel for defendant state their proposition thus:

"Suppose that, in the words complained of, the defendant had gone a step further, and had added at the beginning of the last paragraph the following, so that they would read as follows: 'The picture has been manufactured and produced as an advertisement in the interests of Hudson Maxim and munitions manufacturers by the Vitagraph Company, which is receiving pay therefor. The book was a fine advance notice. The picture was a fine follow-up.' This language would, of course, have identified the plaintiff with the advertisement. It would also have accused it of selfish motives in receiving pay for the advertisement. It would thus have charged directly what the complaint alleges was charged indirectly by the language referred to. But what would such a charge have amounted to? It would merely have charged the plaintiff with doing something which it had a perfect right to do, and something which the law gave it a right to do, namely, to advertise the wares of others and receive pay therefor. This is neither contrary to law nor to morals, and would not in the slightest degree have reflected upon the business integrity, credit, or financial standing of the plaintiff, nor would such a charge necessarily occasion it pecuniary injury."

This puts the question simply and clearly. Of course, it was lawful to advertise munitions through any medium of publicity, and at the time this article was published any person had the right to fair comment in respect of any such advertisement and of the medium of its publication, and, if what defendant published amounted to no more than the criticism of plaintiff corporation for avowedly advertising Mr. Maxim's munitions and stocks, plaintiff could not succeed in the contention that the publication was libelous per se.

But the meaning of the article, when read with all its context (too long to quote here), is not that defendant was attacking an acknowledged advertisement. Shortly stated, what defendant charged was that the plaintiff corporation was producing a motion picture or play called "The Battle Cry of Peace," not to further honorably a propaganda for preparedness and national defense conscientiously believed in by the producer, but to advertise Maxim's munitions wares and stocks by deceptive and disingenuous methods, under cover of a presentation behind which was concealed a mean scheme by which "others * * * were shaking with laughter" at the public's fear aroused by the picture, "and with joy over the fat contracts" the public's fear might bring them. To emphasize this view, the writer made plain that the "picture was a fine follow-up" of Maxim's book "Defenseless America"— all to the end of plaintiff's inducing the public to see a motion picture play, not honestly and fairly put forward to spread and stimulate thought upon and discussion of a policy of national concern, but to excite fear which would result solely in making "a market for his [Maxim's] goods" as a proposition of dollars and cents, contrary and unrelated to and unaffected by patriotic motives and purposes.

The article is not merely an attack on Mr. Maxim. It is also, in effect, an attack on plaintiff as the hypocritical and deceiving assistant in Mr. Maxim's alleged dishonorable scheme of advertisement. Of course, the article in words does not put the matter so baldly. The greatest portector of a libelous publication is the elusive character of language. But the courts long ago decided that a writer must be responsible for the innuendo, as well as for the literal written word;

for no one can fail to appreciate that the shrewd writer often accomplishes his libelous purpose by innuendo. It may be said of one that he is "an honest man!?" and, yet, construed with the context, the exclamation point or the question mark will clearly convey the meaning that the man is dishonest.

[4] It is true, of course, that an innuendo may explain published words, but cannot enlarge them, unless justified by the antecedent facts to which they refer. The principle is concisely stated in McNamara v. Goldan, 194 N. Y. at page 322, 87 N. E. at page 442:

"The office of the innuendo is to explain the meaning and application of the charge contained in the libel, but it cannot be used for the purpose of alleging new matter and extrinsic facts necessary in connection with the alleged libelous publication to constitute a cause of action."

In paragraph IV of the complaint plaintiff alleges that one of its purposes was to further—

"a national propaganda to enlighten the public upon the condition of the country as it was then known, and for the purpose of communicating a great and important message to the American people, with the patriotic end in view of promoting the best interests of the nation."

Such a purpose is not inconsistent with the commercial purpose (frankly admitted by plaintiff) of exhibiting the picture for "the receipts and gains" (paragraph VI of complaint) which would accrue from admission prices paid by the public. Many books, newspaper and magazine articles, and dramas in the history of the world have accomplished useful and patriotic results.

In examining paragraph III of the complaint, supra, it will be seen that the charge is that defendant's publication was—

"meant to and tended to convey the impression to the public that plaintiff was * * * wickedly * * * attempting to inspire in the public mind the belief that this country stood in great danger * * * and that this plaintiff did this from ignoble, dishonest, dishonorable, and treasonable motives."

Whether the motives charged were treasonable need not now be considered. See, however, Press Pub. Co. v. Gillette, 229 Fed. 108, 143 C. C. A. 384.

But it is quite clear that to pretend to arouse the country on patriotic grounds and for patriotic purposes, when, in fact, the concealed scheme really is to advertise munitions wares and stocks for profit, would certainly be self-demonstrable evidence of ignoble, dishonest, and dishonorable motives. Here, again, the innuendo is, not that defendant's publication was confined to charging that plaintiff was merely advertising munitions and munitions stocks, but that plaintiff was using the production as a deceptive cloak for that purpose. Surely such a charge injuriously and directly affects a corporation's property, and necessarily and directly occasions it pecuniary injury within the definitions of Judge Gray in Reporters' Ass'n v. Sun Printing & Pub. Ass'n, 186 N. Y. 437, 79 N. E. 710, and of Mr. Justice Ingraham in Kemble v. Kaighn, 131 App. Div. 63, 115 N. Y. Supp. 809.

It may well be that the article here complained of had no effect on those who were earnest for national preparation nor on those who were strongly opposed thereto; but, obviously, any one who was endeavoring to solve the problem for himself in a fair-minded and

impartial way might readily refuse to see a production which was represented as being a dishonorable scheme of advertisement for the selfish profit of dealers in munitions and stocks, instead of an honest effort to point out serious and important national needs.

Finally, it may be pointed out that there is never any difficulty in freely, fully, and vigorously discussing public affairs by fair criticism and comment; but, when men have invested large sums of money in enterprises, and are endeavoring to conduct these enterprises by honest methods and along honest lines, they are entitled to the protection of their property against the serious consequences of defamation, even though their enterprises are carried on under corporate forms. The courts will not be astute to discover fine distinctions in words, nor scholastic differentiations in phrases, so long as they are sufficiently in touch with affairs to understand the meaning which the man on the street attributes to ordinary everyday English.

Demurrer overruled, with leave to answer within 20 days, failing which, motion for judgment on the pleadings is granted, with costs.