BRANDRETH *vs.* LANCE and others.

The court of chancery has not jurisdiction to restrain the publication of a libel, by injunction, upon a bill filed by the party whose character or business will be injured by the publication.

An injunction to restrain a publication can only be granted in cases where the publication will interfere with the complainant's right either of literary or other property in the subject matter of the publication.

Whether the writer of private letters has such a property in them as to authorize the court of chancery to restrain an improper publication of them, by the person to whom they were directed; *quære* ?

July 16.    THIS case came before the court upon the demurrers of Lance and Hodges, two of the defendants, to the complainant's bill. The complainant was the proprietor and vender of a nostrum known by the name of " Brandreth's Vegetable Universal Pills." And, as the bill alleged, by advertising this medicine extensively in the public papers in the state of New-York and elsewhere, and thus giving publicity to it and its general efficacy in the cure of diseases, the complainant had derived and was still deriving therefrom a comfortable support for himself and his family. The complainant also alleged that for the purpose of vending his pills he had been in the habit of keeping various offices, and of employing many agents and clerks; that among others he had employed the defendant, Lance, but had been obliged to discharge him for improper conduct; that in consequence of being thus discharged Lance became very much enraged and vowed revenge, and threatened to destroy the complainant; and that he thereupon opened a rival establishment for the purpose of vending medicine or pills in the city of New-York. The complainant further charged in his bill, that a short time previous to the filing thereof he had been spoken to by the defendant Trust, and informed that Lance had applied to him to write the complainant's life, and that he was inclined to do so, but would relinquish the undertaking for a bonus of $50; that the complainant spurned the offer, and bade Trust not to presume to repeat such a proposition,

and that shortly thereafter, and previous to the filing of the bill, the complainant received a printed sheet, enclosed to him in a letter, containing the title page and preface and two other pages of a work or pamphlet entitled " The Life, Exploits, Comical Adventures and Amorous Intrigues of Benjamin Brandling, M. D. V. P. L. V. S., a distinguished pill vender, written by himself; interspersed with racy descriptions [of scenes of life in London and New-York;" which work, by the title page, purported to be printed at New-York, by D. M. Hodges, for the proprietors, and to be had of all the booksellers. The residue of this first sheet of the work, which was set out at length in the bill, contained a ludicrous preface in which the complainant was represented as avowing his object in raking up and publishing all the vices and follies of his youth, to be for the double purpose of amusing himself and as a warning to others to avoid them. And the table of contents represented him as being *filius nullius*, or rather as being *filius populi*, the child of many fathers, and as having passed through the various and successive grades of sailor, confectioner, painter, brass founder, pedlar, jeweller, bagman to a pill vender, money broker, author, poet, and dramatist; until he had risen to the rank of a wholesale manufacturer of that rare medicine, upon which the smiles of fortune had been so freely bestowed. The complainant further charged that the before mentioned book, or pamphlet, was then actually printing by the defendant Hodges, for Lance, and under the direction and superintendance of the defendant Trust, who was the author of the work; that the same, so far as appeared by the printed sheet set out in the bill, was a false, malicious, and highly injurious libel, upon the complainant, and was intended to libel him and to bring him into public disgrace and contempt; although in the title page the person whose life it purported to be was called Benjamin Brandling instead of Brandreth, his real name; and that the defendants were printing the work, and causing it to be printed for the purpose and with the intent of publishing the same and

causing it to be widely distributed throughout the country. He therefore prayed for a perpetual injunction restraining the defendants from printing or publishing such book or pamphlet, or the contents thereof, or any part thereof ; and that they might be decreed to deliver up the manuscript of the work, and all and every copy thereof, or of any part of the same printed by them, or either of them, to be cancelled and destroyed ; and for such further or other relief as he might be entitled to in the premises. To this bill the defendants, Lance and Hodges, put in separate demurrers, both as to the discovery and relief sought.

*James Smith*, for the complainant.

*T. W. Clerke*, for the defendant Hodges.

*S. Sherwood*, for the defendant Lance.

THE CHANCELLOR. It is very evident that this court cannot assume jurisdiction of the case presented by the complainant's bill, or of any other case of the like nature, without infringing upon the liberty of the press, and attempting to exercise a power of preventive justice which, as the legislature has decided, cannot safely be entrusted to any tribunal consistently with the principles of a free government. (2 *R. S.* 737, § 1, *and Revisers' note.*) This bill presents the simple case of an application to the court of chancery to restrain the publication of a pamphlet which purports to be a literary work, undoubtedly a tale of fiction, on the ground that it is intended as a libel upon the complainant. The court of star chamber in England, once exercised the power of cutting off the ears, branding the foreheads, and slitting the noses of the libellers of important personages. (*Hudson's Star Chamber*, 2 *Collect. Jurid.* 224.) And, as an incident to such a jurisdiction, that court was undoubtedly in the habit of restraining the publication of such libels by injunction. Since that court was abolished, however, I believe there is but one case up-

on record in which any court, either in this country or in England, has attempted, by an injunction or order of the court, to prohibit or restrain the publication of a libel, as such, in anticipation. In the case to which I allude the notorious Scroggs, chief justice of the court of king's bench, and his associates, decided that they might be safely entrusted with the power of prohibiting and suppressing such publications as they might deem to be libellous. They accordingly made an order of the court prohibiting any person from printing or publishing a periodical, entitled "The Weekly Packet of Advice from Rome, or the History of Popery." The house of commons, however, considered this extraordinary exercise of power on the part of Scroggs as a proper subject of impeachment. (8 *Howell's State Trials*, 198.) And I believe no judge or chancellor from that time to the present has attempted to follow that precedent. There is, indeed, in the reported case of *Du Bost* v. *Beresford*, (2 *Camp. Rep.* 511,) which was an action of trespass against the defendant for destroying a libellous picture, a most extraordinary declaration of Lord Ellenborough, that the Lord Chancellor, upon an application to him, would have granted an injunction against the exhibition of the libellous painting. It is said, however, in a note to *Horne's case,* in the state trials, that this declaration of Lord Ellenborough, in relation to the power of the Lord Chancellor to restrain the publication of a libel by injunction, excited great astonishment in the minds of all the practitioners in the courts of equity. (20 *Howell's St. Tr.* 799.) It must unquestionably be considered as a hasty declaration, made without reflection during the progress of a trial at nisi prius ; and as such it is not entitled to any weight whatever.

The utmost extent to which the court of chancery has ever gone in restraining any publication by injunction, has been upon the principle of protecting the rights of property. Upon this principle alone Lord Eldon placed his decision, in the case of *Gee* v. *Pritchard*, (2 *Swanst. Rep.* 403,) continuing the injunction which restrained the de-

fendant from publishing copies of certain letters written to him by the complainant. But it may, perhaps, be doubted whether his lordship in that case did not, to some extent, endanger the freedom of the press by assuming jurisdiction of the case as a matter of property merely, when in fact the object of the complainant's bill was not to prevent the publication of her letters on account of any supposed interest she had in them as literary property, but to restrain the publication of a private correspondence, as a matter of feeling only. His decision in that case has, however, as I see, received the unqualified approbation of the learned American commentator on equity jurisprudence. (*See* 2 *Story's Eq.* 222, § 948.)

In this case the complainant does not claim the exercise of the extraordinary jurisdiction of this court on the ground of any violation of the rights of literary property, or because a work is improperly attributed to him which will be likely to injure his reputation as an author, or even as a manufacturer of pills. For although his counsel insist that it must necessarily have the effect to injure the sale of his pills, he has not alleged in his bill that he even believes it will have any such effect. And in the absence of such an allegation, I am, as a matter of opinion, inclined to the belief that with that class of persons who would be likely to buy and take his "universal pills," as a general remedy for any and every disease to which the human body is subject, the supposition that he was the author of the publication in question, and was also the extraordinary personage which this table of the contents of the work indicates, would be very likely to induce them to purchase and use his medicine the more readily.

As the publication of the work, therefore, which is sought to be restrained, cannot be considered as an invasion of the rights either of literary or medical property, although it is unquestionably intended as a gross libel upon the complainant personally, this court has no jurisdiction or authority to interfere for his protection. And if the defendants persist in their intention of giving this libellous pro-

duction to the public, he must seek his remedy by a civil suit in a court of law; or by instituting a criminal prosecution, to the end that the libellers, upon conviction, may receive their appropriate punishment, in the penitentiary or otherwise.

The demurrers must be allowed, and the complainant's bill dismissed, as to these defendants, with costs.(*a*)

---

(*a*) See 1 Chitty's General Practice, 697.