(40 Misc. Rep. 415.)

OWEN v. PARTRIDGE, Police Com'r.

(Supreme Court, Special Term, New York County. April, 1903.)

1. MANDATORY INJUNCTION—POLICE DEPARTMENT—PHOTOGRAPHS OF ALLEGED CRIMINAL.
   Where a person is arrested by the police of the city on suspicion of having committed a crime, and his photograph and Bertillon measurements were taken by the police department, he cannot have a mandatory injunction to destroy or surrender the negative and all copies and the record of the measurements.

2. SAME—TRESPASS IN PROCURING.
   The police department, which has taken a photograph of a person supposed to have committed a crime, will not be enjoined from exhibiting or publishing it on the ground that a trespass was committed against plaintiff, in that he was compelled to sit for his photograph.

**8. SAME—RIGHT OF PRIVACY.**

 A supposed criminal, whose photograph has been taken by the police department, cannot have an exhibition thereof enjoined on the ground that his right of privacy has been invaded.

**4. SAME—PUBLICATION OF LIBEL.**

 The publication of a libel cannot be restrained by injunction.

Application by Jacob Owen for injunction against John N. Partridge, commissioner of police of the city of New York. Denied.

Steuer, Hoffman & Wahle, for plaintiff.

George L. Rives, Corp. Counsel, for defendant.

LEVENTRITT, J. This is an application for an injunction pendente lite to restrain the defendant from in any wise publishing the photograph and certain memoranda concerning the appearance or measurements of the plaintiff, and for a mandatory direction that the negative of such likeness, together with all copies and reproductions of it and the memoranda, be destroyed or surrendered to the plaintiff.

The material facts are as follows: The plaintiff is a naturalized citizen. On May 10, 1899, he was arrested by a detective sergeant of the police department, acting under the direction of a superior officer, as he arrived at the pier of an incoming transatlantic steamship. He was arrested without warrant or other written authority, but merely "on suspicion of being implicated in the larceny of $1,-200" from a passenger on a European steamer proceeding to England. He was taken to police headquarters, searched, and a note for $1,200 made by the passenger was found on his person. Then he was photographed, and certain measurements of his person and his weight were taken for preservation in what is known as the Bertillon bureau of the police department. The following morning he was arraigned before a police magistrate and discharged; the officer being unable to produce the passenger to make a complaint, being himself unable to do so, and there being no evidence to submit to the magistrate that the prisoner had committed a crime. Upon being liberated, he went to police headquarters and demanded of the then head of the detective bureau the destruction of the photograph and the measurements. That officer makes affidavit admitting a request, and a promise on his part to comply if certain statements made by the relator should prove to be true. The photograph and measurements were, however, not destroyed, for the reason, as stated by the officer in his affidavit, that "on investigation I learned that he was a man of bad character, and known to the officers of European steamers as a card sharp." The plaintiff swears that he was under the belief that the photograph and measurements had been destroyed until December 22, 1902, when a statement appeared in the newspapers that his picture was contained in the rogues' gallery. It appears that the following circumstances led to this publication: On December 21, 1902, the detective bureau was notified by the Cunard Steamship Company that one of the passengers on an incoming steamship had

¶ 4. See Injunction, vol. 27, Cent. Dig. § 169.

been swindled and cheated at cards out of the sum of £314 sterling by two men, one of whom traveled under the name of Joseph Cohen, and who was so designated on the passenger list. Cohen had left the dock before an officer could apprehend him. Investigation showed that Cohen was Jacob Owen, the passenger identifying him from his picture in the rogues' gallery. Cohen's or Owen's companion was arrested, but was discharged; the magistrate stating that, the offense having been committed on the high seas, he had no jurisdiction of the case. After the newspaper publication referred to, the plaintiff made formal demand, in writing, of the defendant for the removal and destruction of his photograph and measurements. This was refused, and hence this suit.

Several affidavits are submitted as to the plaintiff's reputation. The detective officer who made the arrest in 1899 swears that he had known the relator for five or six years theretofore, and alleges, "of my own knowledge, that his associates are of the worst sort—cheats and gamblers and disreputable people of both sexes—and I was informed and verily believe that he has no occupation, and he is known as a cheap, cheating gambler on all the European steamers." Another detective officer makes affidavit "that the said Jacob Owen is constantly crossing to England and the Continent, with no object in view save that of playing of cards with his fellow passengers and cheating them." The plaintiff denies these and all similar allegations, and avers that he is of good moral character; that he has never been convicted, and never arrested, with the exception of the one instance hereinbefore referred to. The plaintiff also avers that the so-called rogues' gallery contains only the pictures of persons who have been convicted of crime, and who are considered persistent, dangerous, or habitual criminals; that the portraits and measurements are bound in book form, and widely circulated in this country and in Europe. It appears, however, from the affidavit of one of the detective officers who has to do with the gallery, that it contains, also, the pictures of persons who have been charged with crime, and who bear bad reputations in the community; that the gallery is a private collection for the use of the detective force attached to police headquarters, and maintained to aid them in the detection and identification of criminals; that it is not open to the public, but that whenever a person presents himself at police headquarters, complaining that he has been robbed or swindled, and makes out a prima facie case, giving a description of the person who robbed or swindled him, he is permitted, in the exercise of the best judgment of those in charge of the rogues' gallery, to make an examination to determine whether the photograph of the individual charged is in the gallery; and it is alleged that the instances are many where criminals have thus been discovered.

As to the law on this statement of facts:

Even were the plaintiff entitled to any part of the relief he asks, he could not get a mandatory direction on this preliminary application, directing the destruction of the photograph and measurements. That would be the question ultimately to be determined in the action. His maximum relief now would be an injunction restraining the exhibition and publication in any manner of the photograph and measurements.

Mandatory injunctions, granted even on final decree with caution and limitation, are allowed only with rarity on an interlocutory applica-tion, and then in extreme cases, where the right is established with indisputable clearness, and where the final result may otherwise fail to afford complete relief.   High, Inj. § 2;  Kerr, Inj. §§ 230, 251; 16 Am. & Eng. Encyc. of Law, 343;  Close v. Flesher, 8 Misc. Rep. 299, 28 N. Y. Supp. 737; Ward v. Kelsey, 14 Abb. Prac. 106.

The question then becomes, can the plaintiff, on the facts disclosed, secure even partial or limited relief by way of injunction, or, more broadly stated, can the plaintiff, in the event of proving his facts on the trial, have, as a matter of law, any injunctive relief whatsoever, whether mandatory or preventive?

The first point to be considered is, have the plaintiff's rights been invaded?   The acts of the defendant's predecessor in office, so far as this plaintiff is concerned, and the defendant's continuance of them by preserving, exhibiting, or circulating the photograph and meas-urements, can obviously be justified only as an exercise of the police power.   The duty of the police, always existing, and reaffirmed by the charter (Laws 1901, p. 136, c. 466, § 315) to "preserve the public peace, prevent crime, detect and arrest offenders," gives them neces-sarily a wide range of incidental powers to accomplish the mandate of the statute.   The existence of the so-called rogues' gallery, and the taking of photographs, weights, and measurements, finds its authority, if anywhere, in this provision, or in the accepted pre-existing principles of which it is the expression.   So far as habitual criminals are con-cerned—their supervision and control—no serious question could well be raised as to the propriety or legal character of the acts involved. One of the phases of police supervision, says Prof. Tiedeman, in his State & Federal Control of Persons & Property, "is that of photo-graphing alleged criminals, and sending copies of the photograph to all the detective bureaus.   If this is directed by the law as a punish-ment for crime of which the criminal stands convicted, or if the man is in fact a criminal, and the photograph is obtained without force or compulsion, there can be no constitutional or legal objection to the act, for no right has been violated."   The taking of photographs in such cases has authority to support it.  People ex rel. Joyce v. York, 27 Misc. Rep. 658, 59 N. Y. Supp. 418;  State ex rel. Bruns v. Clausmeier, 154 Ind. 599, 57 N. E. 541, 50 L. R. A. 73, 77 Am. St. Rep. 511.   It is a well-known fact, however, and admitted by the de-fendant, that the rogues' gallery contains, as well, the photographs of persons merely suspected of crime.   How far this may be justified as a police measure may be a question not easy of solution.   Prof. Tiedeman intimates that, where the suspicion is well founded, the right exists.  1 Tiedeman, supra, 157, 158.   But what is a well-founded suspicion?   Where the person photographed is not a habitual crim-inal, or has never been convicted of crime so that preventive measures might be justified, or where the suspicion, directed to a particular case, has not sufficient legal basis in fact to warrant some criminal proceeding, the definition of a "suspicious person" becomes vague and shadowy, varying with the circumstances of each case, and meas-ures like those under consideration may approach dangerously near

an arbitrary interference with personal rights. In this case the arrest has nothing but suspicion to support it, and, were it necessary to inquire into the foundation of the suspicion, it would, on the facts disclosed, be found to rest on hearsay merely. The sworn statement of several detectives that the plaintiff was known to them for years as a common cheat and gambler, and as an associate of criminals and disreputable persons, without the disclosure of any fact showing the source of such knowledge, can hardly be deemed sufficient.

In the view that I take of this application, however, I do not deem it necessary to examine further the by no means clear question of the right to take, for police purposes, the photograph of a person merely suspected of crime. Conceding, but not in any wise deciding, that there is no such right, and conceding, further, again without deciding, that, even if there is such a right, the defendant fails to bring himself within the facts permitting its exercise, I am of the opinion that the plaintiff has mistaken his remedy. In other words, conceding that the plaintiff's rights have been invaded, he cannot seek redress for the violation by means of an injunction action.

It is argued on behalf of the plaintiff that a trespass has been committed against him, that a so-called right of privacy has been invaded, that there has been an injury to his character and reputation, and that, as all these wrongs are continuing, he is entitled to injunctive relief.

The only trespass apparent is one that may have been committed in the first instance against his right of personal security, if he was compelled, against his will, to sit for his photograph. That injury, however, is not, nor has it been, continuing. That is past and done, and cannot be enjoined. In effect, the plaintiff's position is that the other injuries which he claims have followed from that as its source. The relief he seeks is not for the alleged unlawful taking of the photograph, but for its alleged unlawful preservation and publication.

This brings us, then, to a consideration of his second claim, which is, in effect, that his right of privacy has been invaded. After some vacillation, rather by way of dictum than decided principle, our Court of Appeals has finally repudiated the doctrine that the right of privacy has any existence in law, or is enforceable in equity. Roberson v. Rochester Folding Box Co., 171 N. Y. 538, 64 N. E. 442, 89 Am. St. Rep. 828:

"The so-called right of privacy is, as the phrase suggests, founded upon the claim that a man has the right to pass through this world, if he wills, without having his picture published, his business enterprises discussed, his successful experiments written up for the benefit of others, or his eccentricities commented upon, either in handbills, periodicals, or newspapers * * *. If such a principle be incorporated into the body of the law through the instrumentality of a court of equity, the attempts to logically apply the principle will necessarily result, not only in a vast amount of litigation, but in litigation bordering upon the absurd, for the right of privacy, once established as a legal doctrine, cannot be confined to the restraint of the publication of a likeness, but must necessarily embrace as well the publication of a word picture—a comment upon one's looks, conduct, domestic relations, or habits."

After examining the history of the phrase "right of privacy," and discussing the cases directly and indirectly bearing upon it, the court concludes:

"An examination of the authorities leads us to the conclusion that the so-called right of privacy has not as yet found an abiding place in our jurisprudence, and, as we view it, the doctrine cannot now be incorporated without doing violence to settled principles of law by which the profession and the public have long been guided." Page 556, 171 N. Y., and page 447, 64 N. E., 89 Am. St. Rep. 828.

In view of this authoritative pronouncement, it would be purposeless to base any argument or relief on the right of privacy. It is settled, for this state at least, that any invasion of one's right to be let alone can be remedied only by a statutory enactment directed against the particular case. The facts in Roberson v. Rochester Folding Box Co., supra, showed a peculiarly aggravated case, in the absolutely unauthorized publication and circulation of an easily recognizable likeness of a reputable young woman as part of an advertisement, spread broadcast, for a brand of flour. Injunctive relief was denied.

An examination of the authorities relied on by the plaintiff on this branch of the case will show that they are based either on dicta, or on principles directly overruled or disapproved in the Roberson Case. Thus Schuyler v. Custis, 147 N. Y. 442, 42 N. E. 22, 31 L. R. A. 286, 49 Am. St. Rep. 671, while containing dicta tending to support the plaintiff's position, in reality proceeded upon the principle that, even if the right of privacy existed, it did not survive the death of the person to the perpetuation of whose memory it was sought to erect a statue. The dicta were considered and rejected in the Roberson Case. So far as the plaintiff relies on the opinions of the lower courts in the Schuyler Case, these are, in view of the reversal of the decisions below, not pertinent. Marks v. Jaffa, 6 Misc. Rep. 290, 26 N. Y. Supp. 908, was a case based on the decision below of the Schuyler Case, which was reversed above.

We are brought, then, to the question of the injury to the plaintiff's character and reputation. But this is a libel, and nothing more (1 Tiedeman, supra, 157; People ex rel. Joyce v. York, supra; State ex rel. Bruns v. Clausmeier, supra), and the publication of a libel cannot be restrained by injunction. Marlin Firearms Co. v. Shields, 171 N. Y. 384, 64 N. E. 163, 59 L. R. A. 310; De Wick v. Dobson, 18 App. Div. 399, 46 N. Y. Supp. 390; N. Y. Juvenile Asylum v. Roosevelt, 7 Daly, 189; Brandreth v. Lance, 8 Paige, 24, 34 Am. Dec. 368; Kidd v. Horry, 28 Fed. 773; Boston Diatite Co. v. Florence Mfg. Co., 114 Mass. 69, 19 Am. Rep. 310; Singer Mfg. Co. v. Domestic S. M. Co., 49 Ga. 70, 15 Am. Rep. 674; Townsh. Sland. & Lib. § 417a et seq.; Odger, Lib. & Sland., *13–16.

"No injunction can be obtained," says Mr. Odger, "to prohibit the publication or republication of any libel or restrain its sale." In the early case of Brandreth v. Lance, supra, the rule was announced that to restrain the publication of a libel by injunction would be an infringement upon the liberty of the press, and an attempted exercise of the power of preventive justice which the Legislature had decided could not safely be intrusted to any tribunal consistently with the principle of a free government; and most recently in Marlin Firearms Co. v. Shields, supra, our Court of Appeals bases its argument, in part, upon the constitutional guaranty of freedom of speech

and press; arguing against equitable interference by showing how the party charged could thereby be punished and deprived of his liberty without trial by jury.

The language in Brandreth v. Lance that "the utmost extent to which the court of chancery has ever gone in restraining any publication by injunction has been upon the principle of protecting the rights of property" is law to-day.

In Marlin Firearms Co. v. Shields, 68 App. Div. 91, 74 N. Y. Supp. 84, it was sought to sustain the injunction on the claim that property rights were involved, but it was expressly recognized that "where the injury is purely personal, like an attack upon character and reputation, equity  *  *  *  has uniformly declined to entertain jurisdiction." The Court of Appeals, reversing, held that there was no precedent in the courts of this state for equitable interference. I must so hold in this case. The English authorities referred to in the brief are distinguished in Kidd v. Horry, supra (followed in De Wick v. Dobson, supra), where it is shown that they are based on specific acts of Parliament which have no counterpart in the legislative enactments here.

The plaintiff's sole injury, if any, has been to his character and reputation. Though he may have suffered wrong, and the injury be irreparable, equity, as administered in this state, can give him no relief, but he must seek his remedy at law. The motion for a preliminary injunction must be denied, with $10 costs.

Motion denied, with $10 costs.