BOGGS, Circuit Judge,
dissenting.
More than twenty years ago, this court determined that the Freedom of Information Act, a federal statute dedicated to open government, requires the release of federal indictees’ booking photographs. The Supreme Court did not correct our reading, and neither did Congress. Nevertheless, today’s majority reverses that determination, citing as justification only a vague privacy interest in inherently non-private matters. Today’s decision obscures our government’s most coercive functions — the powers to detain and accuse— and returns them to the shadows. Open government is too dear a cost to pay for the mirage of privacy that the majority has to offer. I respectfully dissent.
I
Congress passed the Freedom of Information Act (FOIA), 5 U.S.C. § 552, with the purpose of “opening] agency action to the light of public scrutiny.” Dep’t of Air Force v. Rose, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) (quoting Rose v. Dep’t of Air Force, 495 F.2d 261, 263 (2d Cir. 1974)). The Act’s role in promoting democracy is no less critical than in years past, as democracy always “works best when the people have all the information that the security of the Nation permits.” Lyndon B. Johnson, Statement Upon Signing the “Freedom of Information Act” *487 (July 4, 1966), in 2 The Public Papers of the Presidents of the United States, Lyndon B. Johnson: 1966, at 699 (1967); see also Nat’l Archives & Records Admin. v. Favish, 541 U.S. 157, 171-72, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004). To further Congress’s overriding goal of “full agency disclosure,” Rose, 425 U.S. at 360, 96 S.Ct. 1592 (quoting S. Rep. No. 89-813, at 3 (1965)), FOIA “mandates” that agencies disclose records on request unless the government can prove that one of nine “narrowly construed” exemptions applies, Milner v. Dep’t of Navy, 562 U.S. 562, 565, 131 S.Ct. 1259, 179 L.Ed.2d 268 (2011) (quoting FBI v. Abramson, 452 U.S. 615, 630, 101 S.Ct. 2546, 69 L.Ed.2d 280 (1981)).
One of those “narrow” exemptions, Exemption 7(C), allows federal agencies to refuse requests for “records or information compiled for law enforcement purposes” when their public release “could reasonably be expected to constitute an unwarranted invasion of personal privacy.” 5 U.S.C. § 552(b)(7)(C). Because neither party disputes that booking photographs are “records or information compiled for law enforcement purposes,” Exemption 7(C) prompts only two questions in this case. The first is whether booking photographs contain the sort of “intimate personal” information that the law has traditionally considered to be private. Favish, 541 U.S. at 166, 124 S.Ct. 1570. If the government overcomes that burden, it must also show that disclosing such photographs would result in an unwarranted invasion of privacy. Id. at 171, 124 S.Ct. 1570. In my view, the Department of Justice (DOJ) has not met its burden as to either question.
II
Exemption 7(C) allows the government to withhold only those records that invade a cognizable personal privacy interest. 5 U.S.C. § 552(b)(7)(C). It is well settled that not every personal privacy interest counts, and the mere possibility that information might embarrass is not sufficient. See Schell v. U.S. Dep’t of Health & Human Servs., 843 F.2d 933, 939 (6th Cir. 1988); Sims v. CIA, 642 F.2d 562, 575 (D.C. Cir. 1980). We assume that when Congress enacted Exemption 7(C), it was aware of state and federal privacy law, and the deep cultural and legal traditions that that law reflects. See Favish, 541 U.S. at 169, 124 S.Ct. 1570. For this reason, when considering what privacy interests Congress intended Exemption 7(C) to protect, the Supreme Court has looked not to some pliable, amorphous notion of privacy, but rather to history, the common law, and state and federal practice, which together comprise the background against which Congress legislated. See id. at 167-69, 124 S.Ct. 1570; U.S. Dep’t of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 763-70, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). As I see it, this background does not support the recognition of a privacy interest in booking photographs.
A
Controversy surrounding booking photographs, which began soon after American police departments acquired photographic technology in the second half of the nineteenth century, is nothing new. Simone Browne, Race and Surveillance, in Routledge Handbook of Surveillance Studies 72, 74 (Kirstie Ball et al. eds., 2012). By the end of that century, police had begun to compile booking photographs of detainees — convicted or not — and created books and rooms of the portraits called “rogues’ galleries.” See, e.g., Blume v. State, 154 Ind. 343, 56 N.E. 771, 773 (1900); State v. Smith, 190 Mo. 706, 90 S.W. 440, 442 (1905); Rogues’ Gallery Pictures, N.Y. Times, Mar. 29, 1903, at 12. Police depart *488 ments across the country shared booking photographs with one another, see, e.g., State ex rel. Bruns v. Clausmier, 154 Ind. 599, 57 N.E. 541, 542 (1900), and occasionally opened rogues’ galleries to the public for “both technical and moral purposes,” Browne, supra, at 74 (quoting Christian Parenti, The Soft Cage 39 (2003)); see also Simon A. Cole, Suspect Identities 20 (2d prtg. 2002).
Just as today, these early booking photographs brought with them consequences for those depicted. In 1859, the American Journal of Photography observed that “[a]s soon as a rascal becomes dangerous to the public, he is taken to the Rogues’ Gallery and is compelled to leave his likeness there, and from that time on he may be known to any one.” Alan Trachtenberg, Reading American Photographs 29 (6th prtg. 1999) (quoting 2 Am. J. Photography 75, 75-77 (1859)). That likeness would remain on public display long after conviction, see Pa. Prison Soc’y, One Hundred and Second Annual Report, reprinted in 28 J. Prison Discipline 5, 29 (1889), and those photographed often endured “shame, humiliation, and disgrace,” Leger v. Warren, 62 Ohio St. 500, 57 N.E. 506, 507 (1900). Even those subsequently cleared of wrongdoing occasionally found themselves subjected “to ridicule ... and to the constant suspicions of police.” The Fateful Photograph of Duffy, 47 Current Literature 120, 120 (1909).
Nevertheless, the collection and exhibition of booking photographs went unchallenged for decades, and in the absence of a common-law right to privacy, courts rejected early efforts to enjoin the practices. See Owen v. Partridge, 40 Misc. 415, 82 N.Y.S. 248, 250-53 (Sup. Ct. 1903); People ex rel. Joyce v. York, 27 Misc. 658, 59 NY.S. 418, 418 (Sup. Ct. 1899); Publication of Bertillon Measurements and Photographs of Prisoners, Innocent or Acquitted of the Crimes Charged Against Them, 57 Cent. L.J. 261, 261 (1903) (“Under th[e] state of the law [a] ... man has no right of privacy that can be violated by a publication of his picture and measurements in the rogue’s gallery....”). In 1904, for example, New York’s highest court decided one of the first appeals involving an acquitted man’s suit to force police to return his booking photograph. In re Molineux, 177 N.Y. 395, 69 N.E. 727, 728-29 (1904). The court rejected the man’s claim, explaining that his photograph was a matter of public record in which he had no legitimate interest. Id. at 728.
The court’s view was by no means singular. See Shaffer v. United States, 24 App. D.C. 417, 426 (D.C. Cir. 1904); Mabry v. Kettering, 89 Ark. 551, 117 S.W. 746, 747 (1909) (per curiam). As one leading treatise explained, police could lawfully disseminate the booking photographs of even suspected criminals, so long as the suspicion was well founded. See 1 Christopher G. Tiedeman, A Treatise on State and Federal Control of Persons and Property in the United States 157 (1900); accord Leading Legal Article, 17 Harv. L. Rev. 142, 142 (1903) (“So far as the subjects are really suspicious characters, the system cannot be criticised....”); Publication of Bertillon Measurements, supra, at 261.
Early reluctance to interfere with police photography is perhaps unsurprising given that the common law has traditionally protected public access to criminal proceedings. This “tradition of accessibility” was a fundamental aspect of English common law, Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 605, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (quoting Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 589, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (Brennan, J., concurring in the judgment)), and played “a[n] important ... role in the administration of justice *489 ... for centuries before our separation from England,” Press-Enter. Co. v. Superior Court, 464 U.S. 501, 508, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). See generally Richmond Newspapers, 448 U.S. at 567, 100 S.Ct. 2814 (plurality opinion) (“[T]he openness of trials was explicitly recognized as part of the fundamental law of the Colony.”). Nor was the tradition of openness limited to criminal trials. As the Supreme Court has emphasized, “[a]rrests, indictments, convictions, and sentences” are all “public events.” Reporters Comm., 489 U.S. at 753, 109 S.Ct. 1468; see also Paul v. Davis, 424 U.S. 693, 713, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (finding no due-process right to privacy in a “record of an official act such as an arrest”); Sorrentino v. City of Philadelphia, No. Civ. A. 96-6604, 1997 WL 597990, at *7 (E.D. Pa. Sept. 16,1997) (“[A]n individual’s mug shot photo is a matter of public record not subject to constitutional protection.” (citing Davis, 424 U.S. at 712-14, 96 S.Ct. 1155)).
B
The result of the traditional common-law rule was not universally popular, see, e.g., Editorial, 16 Am. Law. 51, 52 (1908); Recent Cases, 13 Yale L.J. 51, 51 (1904), and some courts and legislatures intervened to protect the likenesses of “honest” individuals who had not been convicted, Itzkovitch v. Whitaker, 115 La. 479, 39 So. 499, 500 (1905); see also N.Y. Penal Law § 516 (1909); Downs v. Swann, 111 Md. 53, 73 A. 653, 656 (1909). But even after the development of invasion-of-privacy torts that created a remedy for misleading representations, see 3 Restatement (Second) of Torts § 652E ill. 7, at 397 (Am. Law Inst. 1977), courts recognized that public authorities could disseminate truthful information about a criminal defendant who had already appeared in open court, given that ah individual’s life “ceases to be private by reason of indictment and becomes a matter of public interest,” McGovern v. Van Riper, 140 N.J. Eq. 341, 54 A.2d 469, 472 (N.J. Ch. 1947); see, e.g., E.B. v. Verniero, 119 F.3d 1077, 1099-1100 (3d Cir. 1997); Detroit Free Press, Inc. v. Oakland Cty. Sheriff, 164 Mich.App. 656, 418 N.W.2d 124, 127-30 (1987); City of Carrollton v. Paxton, No. 03-13-00838-CV, 2016 WL 1566400, at *3 (Tex. App. Apr. 14, 2016); Fernicola v. Keenan, 136 N.J. Eq. 9, 39 A.2d 851, 851-52 (N.J. Ch. 1944); Bridges v. State, 247 Wis. 350, 19 N.W.2d 529, 539 (1945).
Thus the outcome of lawsuits against newspapers for publishing photographs of those accused of crimes. Rejecting the no-, tion that arrestees have a legitimate privacy interest in their photographs after indictment, courts have explained that, once indicted, individuals become figures of public interest. Publishing their photographs is thus not an invasion of privacy. See Frith v. Associated Press, 176 F.Supp. 671, 676 (E.D.S.C. 1959); Kapellas v. Kofman, 1 Cal.3d 20, 81 Cal.Rptr. 360, 459 P.2d 912, 924 (1969) (en banc); Coverstone v. Davies, 38 Cal.2d 315, 239 P.2d 876, 880 (Cal. 1952) (en banc); Lincoln v. Denver Post, 31 Colo.App. 283, 501 P.2d 152, 154 (1972); Barbieri v. News-Journal Co., 56 Del. 67, 189 A.2d 773, 774-75 (1963); Pemberton v. Bethlehem Steel Corp., 66 Md. App. 133, 502 A.2d 1101, 1119 (Md. Ct. Spec. App. 1986).
The Restatement of Torts confirms that individuals accused of criminal activity have no cognizable privacy interest with respect to their prosecution because they are “persons of public interest, concerning whom the public is entitled to be informed.” 3 Restatement (Second) of Torts § 652D cmt. f, at 389. In one particularly apposite illustration, the Restatement provides:
*490 A is tried for murder and acquitted. During and immediately after the trial B Newspaper publishes daily reports of it, together with pictures and descriptions of A and accounts of his past history and daily life prior to the trial. This is not an invasion of A’s privacy.
Id. § 652D ill. 13, at 390.
In sum, it appears that the common law did not, and does not now, recognize an indicted defendant’s interest in preventing the disclosure of his booking photograph during ongoing criminal proceedings.
C
Consistent with historical practice and state cpmmon law, the vast majority of states do not recognize a statutory privacy interest that would require state and local authorities to withhold booking photographs in the ordinary case. See, e.g., Opinion No. 03-205, 86 Op. Cal. Att’y Gen. 132, 132-37 (2003); Opinion of June 14, 2007, 92 Md. Op. Att’y Gen. 26, 49. Booking photographs are either available, or presumptively available, to the public under the law of most states. Br. of Amici Curiae Reporters Committee for Freedom of the Press et al. 7; see, e.g., Minn. Stat. § 13.82, subdiv. 26(b); N.D. Cent. Code § 44-04-18.7(2)(i); Neb. Rev. Stat. § 29-3521; Okla. Stat. tit. 51, § 24A.8(A); Va. Code Ann. § 2.2-3706(A)(1)(b); Patterson v. Allegan Cty. Sheriff, 199 Mich.App. 638, 502 N.W.2d 368, 369 (1993); State ex rel. Borzych v. Paluszcyk, 201 Wis.2d 523, 549 N.W.2d 253, 254 (Wis. Ct. App. 1996); Opinion No. 2004-108, 2004 WL 771846 (Op. Ala. Att’y Gen. 2004); Opinion No. 03-09, 2003 WL 21642768 (Op. Haw. Office Info. Practices 2003); Opinion of June 14, 2007, 92 Md. Op. Att’y Gen. at 49-50; Opinion No. 2012-22, 2012 WL 6560753 (Op. Okla. Att’y Gen. 2012); Clayton Norlen, Judge Orders Release of Photos, Des-eret Morning News, May 16, 2009, at B6 (discussing Utah law).
The majority counters that state policies are not conclusive as to Exemption 7(C)’s meaning, and urges that DOJ’s regulations and policies are “[mjore important to the FOIA analysis.” Majority Op. at 484. But DOJ’s own actions undercut its position that individuals have a strong privacy interest in their booking photographs. It was not long ago that DOJ sought to use booking photographs as evidence in criminal proceedings, see, e.g., United States v. Rodriguez, 925 F.2d 1049, 1054 (7th Cir. 1991), and the ATF and FBI maintain a small number of booking photographs on their websites, see Br. of Amici Curiae Reporters Committee for Freedom of the Press et al. 10-11. What is more, although DOJ’s current policy is to not release booking photographs except “when a law enforcement purpose is served,” Appellant Reply Br. 19 n.1; see also 28 C.F.R. § 50.2(b)(7)-(8), even before we ruled on Exemption 7(C)’s applicability, at least one DOJ office appears to have routinely made such photographs available to the media without any law-enforcement rationale at all. See Lou Gefland, Noriega’s Mug Shot Was a Photograph Worth Printing, Minneapolis-St. Paul Star Trib., Jan. 21, 1990, at 23A.
D
The above-described background of history, common law, and state and federal practice gives meaning to the words “personal privacy” in Exemption 7(C), arid suggests that an individual has no cognizable privacy interest in his booking photograph once he has already been indicted and has appeared in open court. Disregarding this legal backdrop, the majority emphasizes the embarrassment that a booking photograph may cause to the depicted individual. Majority Op. at 481-82. Even if an *491 individual’s booking photograph conveys embarrassing information that the public fact of his indictment and his appearance in open court do not, but see Detroit Free Press, Inc. v. Dep’t of Justice (Free Press I), 73 F.3d 93, 97 (6th Cir. 1996), the majority’s emphasis on embarrassment misses the point. Information can be both public and embarrassing, see Sims, 642 F.2d at 575, and the fact that a record is embarrassing does not answer the question whether an individual can reasonably expect that record to remain private, see Schell, 843 F.2d at 939.
In an age in which law enforcement routinely makes booking photographs available to the press, the public has come to expect that such photographs will be accessible. See, e.g., Larry McDermott, Where Are Photos of Church Fire Suspects?, The Republican, Jan. 5, 2009, at C7. Those who are arrested are aware of this reality, and some even use their booking photographs as a way to communicate with the public. See, e.g., Giacomo Papi, Under Arrest 177 (2006) (describing booking photograph in which “Steve McQueen raises his hand in a peace sign”); Joe Tacopino, Perry’s Mug of Defiance, N.Y. Post, Aug. 20, 2014, at 25 (“Texas Gov. Rick Perry gave a confident smile as he posed for his mug shot_”); Snippets, Hous. Chron., Apr. 15, 1996, at 2 (describing booking photograph in which Jane Fonda “do[es] [a] ‘Power to the People’ raised-fist salute”). Unlike deeply personal matters, such as the death-scene images at issue in National Archives & Records Administration v. Favish, 541 U.S. 157, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004), individuals simply do not expect their booking photographs to remain shielded from .public view.
Of course, an individual can have a statutory privacy interest in information that is public. In United States Department of Justice v. Reporters Committee for Freedom of the Press, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989), the Supreme Court found a cognizable privacy interest in rap sheets that contained publicly available information about individuals’ arrests, charges, convictions, and incarcerations. Id. at 752, 770-71, 109 S.Ct. 1468. But it does not follow that all public information “connecting an individual to criminality” is protected by a statutory right to privacy. Majority Op. at 481. The Reporters Committee Court emphasized that rap sheets are different from other sorts of publicly available records because they compile “otherwise hard-to-obtain” information from multiple offices in multiple jurisdictions into one document, thus “altering] the privacy interest implicated by the disclosure of that information.” 489 U.S. at 764, 109 S.Ct. 1468. The booking photographs at issue here, by contrast, do not compile any information that is difficult to find.
The majority also puts great emphasis on the fact that “an idle internet search reveals the same booking photo that once would have required a trip to the local library’s microfiche collection.” Majority Op. at 482. That is undoubtedly true. But the same could be said of any of the now-digitized information that was once hidden away in the dusty basements of courthouses and libraries. Surely the majority would not agree that an individual has a cognizable privacy interest in his court filings or public statements simply because they too may turn up in an “idle internet search.” If anything, the ease with which a third party today can find an individuals indictment and arrest would seem to cut against finding a cognizable privacy interest in booking photographs. Cf. ACLU v. U.S. Dep’t of Justice, 655 F.3d 1, 12 (D.C. Cir. 2011) (observing that public disclosure of docket-sheet numbers of selected criminal cases “will simply provide one more *492 place in which a computerized search will find the same person’s name and conviction”).
In sum, the majority is able to find a privacy right in booking photographs only by espousing a narrow conception of public information that is out of step with the “literal understanding]” of privacy. Reporters Comm., 489 U.S. at 763, 109 S.Ct. 1468; see also Webster’s Ninth New Collegiate Dictionary 936 (1986) (defining “private” as “not ... intended to be known publicly” or “unsuitable for public use or display”); Reporters Comm., 489 U.S. at 753, 109 S.Ct. 1468 (explaining that “[a]r-rests” and “indictments” are “public events”). An individual who has already been indicted, and who has already appeared in open court, has no cognizable privacy interest in his booking photograph because neither he nor society expects that it will remain hidden from public view.
Ill
Even if an indicted individual has a privacy interest in his booking photograph, whatever invasion of privacy disclosure occasions is not “unwarranted” in light of the weighty public interests that disclosure serves. Public oversight is essential in criminal proceedings, in which the government wields the power to place the individual in jeopardy of imprisonment. Closing a window into such proceedings undermines the public confidence that is essential to any effective criminal-justice system, for it is “difficult for [citizens] to accept what they are prohibited from observing.” Richmond Newspapers, 448 U.S. at 572, 100 S.Ct. 2814 (plurality opinion); see also Press-Enter. Co., 464 U.S. at 508-09, 104 S.Ct. 819. Applying this principle, we have emphasized the role of “the public, deputizing the press as the guardians of their liberty,” in shielding the individual from governmental abuse. Detroit Free Press v. Ashcroft, 303 F.3d 681, 683 (6th Cir. 2002). Booking photographs play an important role in educating the public about its government, just as open courts and open hearings do.
Measured against the photographed individual’s meager interest in avoiding the disclosure of matters that are largely available in the public domain, see ACLU, 655 F.3d at 12, the public’s interest in knowing whom the government is prosecuting is strong. The regular release of booking photographs helps to avoid cases of mistaken identity, by prompting individuals to assist the government in finding the actual perpetrator. Cases of mistaken identity are all too common, see, e.g., Topher Sanders, Name Mix-Up in Sexual Battery Case Sends Wrong Clay County Teen to Jail for 35 Days, Fla. Times-Union, Feb. 24, 2014; Christopher N. Osher, Mistaken Identities Errors Clutter Denver Arrests, May 24, 2009, Denver Post, at A1, and photographs can help to clear the names of innocent individuals, see, e.g., Joyce Purnick, Few Answers After Settling a Bad Arrest, N.Y. Times, Mar. 15, 2001, at B1.
Moreover, booking photographs also reveal what populations the government prosecutes — black or white, young or old, female or male — and for what sorts of alleged crimes. Their release may raise questions about prosecutorial decisions, enabling the public to detect and hold to account prosecutors who disproportionately charge or overlook defendants of a particular background or demographic. Such oversight is important in a system such as ours, in which prosecutors enjoy wide discretion in choosing whom to charge. See United States v. Armstrong, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). Indeed, giving public authorities discretion to release booking photographs may even create the potential for, or the perception of, unfairness. Cf. Todd Wal- *493 lack, Bost. Globe, Mar. 11, 2015, at A (recounting allegations that “police ... treat [disclosure of] charges against their own officers differently than the general public”); Alex Zielinski, The Brock Turner Mug Shot Police Really Didn’t Want You to See, ThinkProgress (June 6, 2016, 6:09 PM), http://thinkprogress.org/justice/2016/ 06/06/3785310/brock-turner-mugshot (“One Twitter user ... posted screenshots from past Washington Post articles to make the point that [the white defendant] was being treated differently....”).
Booking photographs can also help the public learn about what the government does to those whom it detains. In Free Press I, we explained that “[h]ad the now-famous videotape of the Rodney King beating in Los Angeles never been made, a mug shot of Mr. King released to the media would have alerted the world that the arrestee had been subjected to much more than a routine traffic stop and that the actions and practices of the arresting officers should be scrutinized.” 73 F.3d at 98. Our observation was not conjecture. In one recent example, the release of a New Mexico booking photograph that showed an arrestee’s bloodied and scratched face prompted local media to inquire into the circumstances of his arrest. See Royale Da, MDC: State Fair Worker Assaulted by Inmate Prior to Mugshot, KOAT 7 Albuquerque (Sept. 18, 2014), http://www.koat. com/news/mdc-state-fair-worker-assaulted-by-inmate-prior-to-mugshot/28141730. In another, the publication of an Alabama booking photograph that showed an individual with “two black eyes” led “viewers [to] expres[s] outrage” because “[t]hey think authorities used excessive force.” Rae Larkins, Large Amount of “Spice” Recovered in Dothan Bust, KCBD 11 (Feb. 19, 2016, 3:08 PM), http://www.kcbd. com/story/31199484/large-amount-of-spice-recovered-in-dothan-bust. These anecdotes suggest that booking photographs play a role in building public awareness of what law enforcement does 'and why, which in turn enables the public to hold authorities to account.
The majority ignores these benefits and omits the question of balancing altogether, leaving it to DOJ to make a case-by-case determination of whether it believes that the release of a particular booking photograph serves its own purposes. See Majority Op. at 484-85. That decision undermines FOIA’s goal of disclosure by effectively making DOJ the arbiter of whether a booking photograph will be made public. Under FOIA, the burden of justifying nondisclosure should always fall on the government. Reporters Comm., 489 U.S. at 755, 778, 109 S.Ct. 1468. But if newspapers like the Detroit Free Press have to “wrangle with” DOJ “over the relative public interest” of every single booking photograph that they seek to publish, few, if any, booking photographs that DOJ withholds will become public because “[n]o newspaper could ever timely publish booking photos alongside an article about a new indictment.” Appellee Supp. Br. 25.
Even if news organizations bear the time and expense of taking DOJ to court, “assigning federal judges the task of striking a proper case-by-case ... balance between individual privacy interests and the public interest in” disclosure is likely to be onerous, especially as the basis of these “ad hoc” decisions would be largely standardless. Reporters Comm., 489 U.S. at 776, 109 S.Ct. 1468. Nor does it help much that a detainee may “waive” his or her privacy interest. Majority Op. at 485. FOIA does not require agencies to notify an individual when a third party requests his records. Maj. John F. Joyce, The Privacy Act, 99 Mil. L. Rev. 113, 156 (1983). In the absence of such notice, few indictees in the midst of organizing a defense will *494 know to request their own booking photographs under FOIA or the Privacy Act, 5 U.S.C. § 552a. Moreover, the release of one individual booking photograph could never reveal the structural disparities in prosecutorial discretion that the regular release of many could. Cf. Floyd v. City of New York, 861 F.Supp.2d 274, 290 (S.D.N.Y. 2012). For these reasons, the Supreme Court has suggested that in cases such as this one, where the “individual circumstances” of a given request are less important than the effect of disclosure on the whole, Exemption 7(C) allows for categorical determinations. Reporters Comm., 489 U.S. at 776, 109 S.Ct. 1468.
IV
I am not unaware of the consequences of releasing booking photographs in the Internet Age. Ever since the nineteenth century, booking photographs have proven to be a source of discomfort to those depicted. See, e.g., Warren, 57 N.E. at 507; Pa. Prison Soc’y, supra, at 29; The Fateful Photograph of Duffy, supra, at 120. But today’s decision does nothing to prohibit DOJ from using its broad discretion to release booking photographs when it chooses. Nor does today’s decision do anything to protect the likenesses of those arrested by state authorities, the majority of which disclose booking photographs to the media upon request. See, e.g., Carissa Wolf et al., FBI Seals Off Ore. Refuge After Arrests, Wash. Post, Jan. 28, 2016, at Al (depicting state booking photographs of individuals awaiting disposition of federal charges). All that today’s decision does is provide DOJ with a tool to selectively shield itself from public scrutiny.
It is possible that other means could be used to achieve a sensible balance between reputational concerns and the free flow of public information. See, e.g., Act of May 6, 2013, § 1, 2013 Ga. Laws 613, 614 (requiring website owners to remove booking photographs of those acquitted of criminal activity); Taha v. Bucks County, 9 F.Supp.3d 490, 494 (E.D. Pa. 2014) (holding that individual depicted on “bus-tedmugshots.com” with the “legend ‘BUSTED!’ in large bold letters over his mugshot” could maintain state-law “false light” tort claim where individual’s arrest record had in fact been expunged). But today’s decision, which deprives the public of vital information about how its government works and does little to safeguard privacy, is not the correct answer. For these reasons, I respectfully dissent.